EXHIBIT J

1   MATTHEW D. POWERS (Bar No. 104795)
    matthew.powers@weil.com
2   STEVEN S. CHERENSKY (Bar No. 168275)
    steven.cherensky@weil.com
3   WEIL, GOTSHAL & MANGES LLP
    Silicon Valley Office
4   201 Redwood Shores Parkway
    Redwood Shores, CA 94065
5   Telephone: (650) 802-3000
    Facsimile: (650) 802-3100
6
    TIMOTHY DEMASI
7   tim.demasi@weil.com
    STEVEN KALOGERAS
8   steven.kalogeras@weil.com
    JULIAN MOORE
9   julian.moore@weil.com
    WEIL, GOTSHAL & MANGES LLP
10  New York Office
    767 5th Avenue
11  New York, NY 10153
    Telephone: (212) 310-8000
12  Facsimile: (212) 310-8007

13  Attorneys for Plaintiffs
    SAMSUNG ELECTRONICS CO., LTD.
14  SAMSUNG ELECTRONICS AMERICA, INC.

15              UNITED STATES DISTRICT COURT

16            NORTHERN DISTRICT OF CALIFORNIA

17

18  SAMSUNG ELECTRONICS CO., LTD. and        Case No.
    SAMSUNG ELECTRONICS AMERICA, INC.,
19
            Plaintiffs,
20                                           COMPLAINT FOR DECLARATORY
                                             JUDGMENT
21      v.

22  VERTICAL COMPUTER SYSTEMS, INC.,         DEMAND FOR JURY TRIAL

23          Defendant.

24          Plaintiffs Samsung Electronics Co., Ltd. and Samsung Electronics America, Inc.

25  (collectively "Samsung"), by and through their attorneys, bring this action against Vertical

26  Computer Systems, Inc. ("Vertical") and allege as follows:

27

28

COMPLAINT FOR DECLARATORY JUDGMENT

1

## INTRODUCTION

2         1.      Samsung seeks a declaratory judgment that (i) Samsung has not infringed

3    any claim of United States Patent Nos. 6,826,744 ("the '744 patent") or 7,716,629 ("the '629

4    patent); and (ii) each and every claim of the '744 and '629 patents is invalid and/or

5    unenforceable. The '744 and '629 patents are attached as Exhibit A and Exhibit B, respectively.

6         2.      The Northern District of California is already presiding over a related

7    declaratory judgment action brought by Interwoven, Inc. ("Interwoven") against Vertical, Civil

8    Case No. 10-CV-4645 ("the California action"), which similarly seeks a judgment of invalidity,

9    unenforceability and non-infringement of the '744 and '629 patents. The California Action was

10   filed on October 14, 2010.

11        3.      Over one month later, on November 15, 2010, Vertical filed suit in the

12   Eastern District of Texas, Civil Case No. 2:10-CV-490 (the "Texas action"), accusing

13   Interwoven, Samsung, and two LG Electronics entities of infringing the same '744 and '629

14   patents.

15        4.      Vertical's initiation of the Texas action has resulted in a duplicative and

16   wasteful litigation in a new forum of the same issues being litigated in the California action.

17   Samsung has given notice to this Court that the present declaratory judgment action is related to

18   the first-filed California action so that the two actions may be consolidated and that the parties

19   may proceed in a manner that promotes judicial economy, avoids the potential for conflicting

20   rulings, and leads to an efficient resolution of these overlapping disputes.

21

## PARTIES

22        5.      Samsung Electronics Co., Ltd. is a corporation organized under the laws of

23   Korea, with a principal place of business at Samsung Electronics Building, 1320-10, Seocho-2-

24   dong, Seochu-gu, Seoul 137-857, Korea.

25        6.      Samsung Electronics America, Inc. is a corporation organized under the

26   laws of New York, with a principal place of business at 105 Challenger Road, Ridgefield Park,

27   New Jersey 07660.  Samsung Electronics America, Inc. is a wholly owners subsidiary of

28   Samsung Electronics Co., Ltd.

**COMPLAINT FOR DECLARATORY JUDGMENT**

1          7.      On information and belief, Vertical is a company organized under the laws

2    of Delaware, with a principal place of business at 101 W. Renner Road, Suite 300, Richardson,

3    Texas 75082.

4                          **EXISTENCE OF AN ACTUAL CONTROVERSY**

5          8.      There is an actual controversy within the jurisdiction of this Court under 28

6    U.S.C. §§ 2201 and 2202.

7          9.      Vertical purports to be the owner of the '744 and '629 patents (collectively,

8    "the Patents-in-Suit").

9          10.     On November 15, 2010, Vertical filed the Texas action, alleging that

10   Samsung infringes the Patents-in-Suit. Specifically, Vertical alleges that Samsung infringes

11   claims 1, 3-5, 9, 17, 21, 23 and 25 of the '744 patent and claims 1, 4, 8, 10, 12, 21, 24, 28, 30, and

12   32 of the '629 patent, both directly and indirectly, through the commercialization of the Samsung

13   Galaxy Tab™ Android tablet and Samsung's Captivate™, Fascinate™, Epic™ and Mesmerize™

14   i500 Android cell phones.

15         11.     Samsung denies that it infringes any of the Patents-in-Suit, and disputes

16   their validity. Samsung further denies that it needs a license to any of the Patents-in-Suit in order

17   to continue its activities. Thus, an actual and justiciable controversy exists between Vertical and

18   Samsung as to whether the Patents-in-Suit are infringed and/or invalid.

19                               **JURISDICTION AND VENUE**

20         12.     This Court has subject matter jurisdiction over Samsung's Declaratory

21   Judgment claims pursuant to 28 U.S.C. §§ 2201 and 2202.

22         13.     This Court also has original subject matter jurisdiction over the claims

23   asserted herein pursuant to 28 U.S.C. §§ 1331 and 1338(a).

24         14.     On information and belief, Vertical is subject to personal jurisdiction in

25   this district arising out of its contacts with this district as well as Vertical's acquiescence to this

26   district's jurisdiction in the California action. In particular, Vertical has filed a motion to dismiss

27   and/or transfer in the California action without raising the defense of lack of personal jurisdiction,

28   thereby waiving any objection to the propriety of personal jurisdiction in this district.

COMPLAINT FOR DECLARATORY JUDGMENT

APP. 148

1           15.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because, for

2  the reasons set forth above, Vertical is subject to personal jurisdiction within this judicial district.

3                          **FIRST CLAIM – THE '744 PATENT**

4           16.     Samsung hereby restates and realleges the allegations · set forth in

5  paragraphs 1 through 15 above and incorporates them by reference.

6           17.     No claim of the '744 patent has been or is infringed, either directly or

7  indirectly, or either literally or under the doctrine of equivalents, by Samsung.

8           18.     The claims of the '744 patent are invalid for failure to comply with the

9  requirements of the Patent Laws of the United States, including but not limited to the provisions

10  of 35 U.S.C. §§ 101, 102, 103, and/or 112.

11          19.     The claims of the '744 patent are unenforceable as a result of inequitable

12  conduct before the United States Patent and Trademark Office ("PTO"). One or more of the

13  people substantively involved in the prosecution of the application leading to the '744 patent,

14  including inventor Aubrey McAuley, were aware of information material to the patentability of

15  the '744 patent, but withheld that information from the PTO with the intent to deceive, and made

16  false and misleading statements to the PTO during the prosecution of the '744 patent, as set forth

17  herein.

18          20.     Aubrey McAuley, the named inventor of the '744 patent, was a founder

19  and president of Adhesive Media, Inc. ("Adhesive").

20          21.     On information and belief, Adhesive offered for sale and sold software

21  products and/or services based on its "WebOS" technology more than one year before October 1,

22  1999, the filing date of the application leading to the '744 patent. Those software products and/or

23  services included Adhesive's "NewsFlash" product, as well as a number of websites that

24  Adhesive designed for particular customers, purportedly using Adhesive's WebOS technology.

25          22.     On information and belief, Adhesive also published information relating to

26  its software products and/or services based on its "WebOS" technology more than one year

27  before October 1, 1999. For example, more than one year before October 1, 1999, Adhesive

28  posted on the Internet a diagram of the Web Object Management Facility of its WebOS

COMPLAINT FOR DECLARATORY JUDGMENT

1  technology, which is attached hereto as Exhibit C.

2          23.    Exhibit C is nearly identical to Figure 5 of the '744 patent.

3          24.    The specification of the '744 patent describes Figure 5 as an alleged

4  embodiment of "the present invention." See '744 patent at 5:3-17.

5          25.    Therefore, Adhesive's commercial offer for sale and sale of products and

6  services based on its WebOS technology, and Adhesive's publication of information relating to

7  its WebOS technology, all of which occurred more than one year before October 1, 1999,

8  constitute material prior art.

9          26.    Upon information and belief, prior to issuance of the '744 patent, Mr.

10  McAuley had knowledge of Adhesive's offer for sale and sale of its WebOS technology and

11  Adhesive's publication of information relating to its WebOS technology.

12          27.    None of the persons involved in the prosecution of the '744 patent,

13  including but not limited to Mr. McAuley, disclosed to the PTO Adhesive's offer for sale or sale

14  of it WebOS technology or the publication of information relating to its WebOS technology.

15          28.    Information regarding Adhesive's offer for sale and sale of WebOS

16  technology, and publications relating thereto, was withheld from the PTO with intent to deceive.

17          29.    This withholding of information material to patentability with intent to

18  deceive the PTO constitutes inequitable conduct, which renders the '744 patent unenforceable.

19                          **SECOND CLAIM – THE '629 PATENT**

20          30.    Samsung hereby restates and realleges the allegations set forth in

21  paragraphs 1 through 29 above and incorporates them by reference.

22          31.    No claim of the '629 patent has been or is infringed, either directly or

23  indirectly, or either literally or under the doctrine of equivalents, by Samsung.

24          32.    The claims of the '629 patent are invalid for failure to comply with the

25  requirements of the Patent Laws of the United States, including but not limited to the provisions

26  of 35 U.S.C. §§ 101, 102, 103, and/or 112.

27          33.    The claims of the '629 patent are unenforceable as a result of inequitable

28  conduct before the PTO. On information and belief, one or more of the people substantively

COMPLAINT FOR DECLARATORY JUDGMENT

                                    5                                    APP. 150

1  involved in the prosecution of the application leading to the '629 patent, including inventor
2  Aubrey McAuley and patent agent Jack D. Stone Jr., were aware of information material to the
3  patentability of the '629 patent, but withheld that information from the PTO with the intent to
4  deceive, and made false and misleading statements to the PTO during the prosecution of the '629
5  patent, as set forth herein.

6          34.    During the prosecution of the '629 patent, Vertical initiated a patent
7  infringement suit against Microsoft Corporation in the Eastern District of Texas, Civil Action No.
8  2:07-CV-144 ("the Microsoft litigation"), alleging infringement of the '744 patent.

9          35.    During the course of the Microsoft litigation, material information
10 regarding the patentability of the '744 patent was disclosed by Microsoft to Vertical and
11 Vertical's attorneys. For example, Microsoft raised inequitable conduct allegations regarding the
12 '744 patent in its Answer to Vertical's complaint, Microsoft served invalidity contentions
13 explaining how numerous prior art references anticipated and/or rendered obvious the claims of
14 the '744 patent, Microsoft produced copies of the underlying prior art references, and Microsoft
15 filed a claim construction brief arguing that numerous claims of the '744 patent were invalid
16 under 35 U.S.C. § 112. However, this material information was not properly disclosed to the
17 PTO during the prosecution of the '629 patent.

18         36.    Because the application leading to the '629 patent is a continuation of the
19 '744 patent, and because the claims and specifications of the '629 and '744 patents are
20 substantially similar, Microsoft's inequitable conduct allegations, invalidity contentions and
21 arguments, and the invalidating prior art references it produced in the Microsoft litigation are also
22 material to the patentability of the '629 patent.

23     **A.    Microsoft's Inequitable Conduct Allegations**

24         37.    On July 13, 2007, Microsoft filed its Answer, Affirmative Defenses, and
25 Counterclaims ("Microsoft's Answer") in the Microsoft litigation. Microsoft alleged that the
26 '744 patent was unenforceable due to the inequitable conduct of Mr. McAuley in failing to
27 disclose material information to the PTO. In particular, Microsoft alleged that Mr. McAuley,
28 with intent to deceive, failed to disclose Adhesive's offer for sale and sale of products and

COMPLAINT FOR DECLARATORY JUDGMENT

1    services based on Adhesive's WebOS technology, and publications relating thereto, more than

2    one year prior to October 1, 1999.

3          38.    Microsoft's inequitable conduct allegations disclose critical information

4    expressly challenging the validity and enforceability of the related '744 patent, and thus constitute

5    material prior art.

6          39.    None of the persons involved in the prosecution of the '629 patent,

7    including Mr. McAuley and Mr. Stone, disclosed to the PTO either Microsoft's Answer or the

8    existence or substance of Microsoft's inequitable conduct allegations.

9          40.    Further, during prosecution of the '629 patent, the applicants disclosed

10   certain prior art documents relating to Adhesive's prior art WebOS technology relied on by

11   Microsoft during the Microsoft litigation, but failed to disclose the critical facts that Mr. McAuley

12   was the founder and president of Adhesive and other information indicating that the WebOS

13   technology qualified as prior art under 35 U.S.C. § 102(b).

14         41.    The knowledge that Mr. McAuley is both a named inventor of the '629

15   patent and the founder and president of Adhesive, as well as the date of the WebOS materials, is

16   essential for the PTO to fully understand the relevance and applicability of Adhesive's prior art

17   WebOS technology.

18         42.    During prosecution of the '629 patent, the applicants selectively disclosed

19   to the PTO only certain information and prior art materials from the Microsoft litigation.

20         43.    The selective disclosure to the PTO of information arising out of the

21   Microsoft litigation demonstrates that Mr. McAuley and Mr. Stone were aware of the Microsoft

22   litigation and the existence of material regarding the patentability of the '629 patent information

23   arising out of that litigation.

24         44.    This selective disclosure to the PTO also demonstrates that Mr. McAuley

25   and Mr. Stone made a deliberate decision to withhold material information from the PTO, and

26   thus demonstrates an intent to deceive.

27         45.    The withholding of information material to patentability with intent to

28   deceive constitutes inequitable conduct, which renders the '629 patent unenforceable.

COMPLAINT FOR DECLARATORY JUDGMENT

APP. 152

1  **B.    Microsoft's Invalidity Contentions and Claim Construction Brief**

2       46.    On January 18, 2008, Microsoft served its Invalidity Contentions in the
3  Microsoft litigation.

4       47.    Microsoft's Invalidity Contentions identified 58 prior art references that
5  anticipated and/or rendered obvious claims 1-5, 9, 11, 17-19, 21, 23, 25-29, 33, 39-41, 43, 45, and
6  47-48 of the '744 patent and provided over 50 pages of narrative analysis of how the identified
7  prior art anticipated and/or rendered obvious the asserted claims. The Invalidity Contentions also
8  included over 250 pages of claim charts mapping the prior art references to each limitation of the
9  asserted claims. Further, the Invalidity Contentions include an analysis of the '744 patent's
10  invalidity based on lack of enablement, lack of written description, and indefiniteness.

11       48.    On July 18, 2008, Microsoft served its First Amended Invalidity
12  Contentions in the Microsoft litigation.

13       49.    Microsoft's First Amended Invalidity Contentions added three prior art
14  references to Microsoft's prior Invalidity Contentions, identifying a total of 61 prior art references
15  that anticipated and/or rendered obvious claims 1-5, 9, 11, 17-19, 21, 23, 25-29, 33, 39-41, 43, 45,
16  47-48, and 53 of the '744 patent. As with the initial Invalidity Contentions, Microsoft First
17  Amended Invalidity Contentions provided over 50 pages of narrative analysis of how the
18  identified prior art anticipated and/or rendered obvious the asserted claims and included over 250
19  pages of claim charts mapping the prior art references to each limitations of the asserted claims.
20  Further, the First Amended Invalidity Contentions include an analysis of the '744 patent's
21  invalidity based on lack of enablement, lack of written description, and indefiniteness.

22       50.    On June 6, 2008, Microsoft filed its Claim Construction Brief in the
23  Microsoft litigation.

24       51.    Microsoft argued in its Claim Construction Brief that the term "arbitrary
25  object framework" is fatally indefinite.

26       52.    The term "arbitrary object framework" is found in all independent claims
27  of both the '744 and '629 patents, making Microsoft's indefiniteness argument material to the
28  patentability of the '629 patent.

1   53.   Microsoft's Invalidity Contentions, First Amended Invalidity Contentions,

2   and Claim Construction Brief disclose critical information expressly challenging the validity of

3   the related '744 patent, and thus constitute material prior art.

4   54.   None of the persons involved in the prosecution of the '629 patent,

5   including Mr. McAuley and Mr. Stone, disclosed to the PTO Microsoft's Invalidity Contentions,

6   First Amended Invalidity Contentions, or Claim Construction Brief. Further, none of the persons

7   involved in the prosecution of the '629 patent, including Mr. McAuley and Mr. Stone, disclosed

8   to the PTO the existence of Microsoft's Invalidity Contentions, First Amended Invalidity

9   Contentions, or Claim Construction Brief or the substance of the invalidity arguments set forth

10  therein.

11  55.   Only some prior art references relied on during the Microsoft litigation

12  were selectively disclosed to the PTO during prosecution of the '629 patent.

13  56.   The selective disclosure to the PTO of information arising out of the

14  Microsoft litigation demonstrates that Mr. McAuley and Mr. Stone were aware of the Microsoft

15  litigation and the existence of material information regarding the patentability of the '629 patent

16  arising out of that litigation.

17  57.   This selective disclosure to the PTO also demonstrates that Mr. McAuley

18  and Mr. Stone made a deliberate decision to withhold material information from the PTO, and

19  thus demonstrates an intent to deceive.

20  58.   The withholding of information material to patentability with intent to

21  deceive constitutes inequitable conduct, which renders the '629 patent unenforceable.

22  **C.   Prior Art References Produced by Microsoft**

23  59.   In an Information Disclosure Statement, the '629 patent applicants

24  disclosed to the PTO 24 of the 61 prior art references (or excerpts thereof) that were identified by

25  Microsoft in its Invalidity Contentions and First Amended Invalidity Contentions as anticipating

26  and/or rendering obvious certain claims of the '744 patent.

27  60.   On information and belief, none of the persons involved in the prosecution

28  of the '629 patent, including Mr. McAuley and Mr. Stone, disclosed to the PTO any references

COMPLAINT FOR DECLARATORY JUDGMENT

9

1   identified in Microsoft's Invalidity Contentions or First Amended Invalidity Contentions that

2   pertain to the prior art Borland Delphi technology. Specifically, none of the persons involved in

3   the prosecution of the '629 patent disclosed to the PTO: (i) *Borland Delphi 3 for Windows 95 &*

4   *Windows NT, User's Guide*, Borland International, Inc. (1997); (ii) *Borland's Official No-*

5   *Nonsense Guide to Delphi 2*, Sams Publishing (1996); (iii) Osier et al., *Teach Yourself Delphi 3*

6   *in 14 Days*, Sams Publishing (1997); (iv) Reisdorph, *Sams Teach Yourself Borland Delphi 4 in 21*

7   *Days*, Sams Publishing (1998); (v) Swan, *Delphi 4 Bible*, IDG Books Worldwide, Inc., Tom

8   Swan (1998); (vi) Teixeira et al., *Borland Delphi 4 Developer's Guide*, Sams Publishing (1998).

9          61.     On information and belief, none of the persons involved in the prosecution

10   of the '629 patent, including Mr. McAuley and Mr. Stone, disclosed to the PTO any references

11   identified in Microsoft's Invalidity Contentions or First Amended Invalidity Contentions that

12   pertain to the prior art Microsoft Visual J++ technology. Specifically, none of the persons

13   involved in the prosecution of the '629 patent disclosed to the PTO: (i) Doss, *DCOM Networking*

14   *with Visual J++ 6.0*, Wordware Publishing, Inc. (1999); (ii) Morgan et al., *Visual J++*

15   *Unleashed*, Sams.net Publishing (1997); (iii) Mulloy, *Using Visual J++ 6*, Que Corporation

16   (1998); (iv) Wood, *Visual J++ 6 Secrets*, IDG Books Worldwide, Inc. (1998).

17          62.     On information and belief, none of the persons involved in the prosecution

18   of the '629 patent, including Mr. McAuley and Mr. Stone, disclosed to the PTO any references

19   identified in Microsoft's Invalidity Contentions or First Amended Invalidity Contentions that

20   pertain to the prior art ASP technology. Specifically, none of the persons involved in the

21   prosecution of the '629 patent disclosed to the PTO: (i) Fedorchek et al., *ASP: Active Server*

22   *Pages*, IDG Books Worldwide, Inc. (1997); (ii) Fedorov et al., *ASP 2.0 Programmer's Reference*,

23   Wrox Press (1998).

24          63.     On information and belief, none of the persons involved in the prosecution

25   of the '629 patent, including Mr. McAuley and Mr. Stone, disclosed to the PTO any references

26   identified in Microsoft's Invalidity Contentions or First Amended Invalidity Contentions that

27   pertain to the prior art Lotus Notes and Domino 4.5 technology. Specifically, none of the persons

28   involved in the prosecution of the '629 patent disclosed to the PTO: (i) Forlini et al., *Lotus Notes*

COMPLAINT FOR DECLARATORY JUDGMENT

10

1  *and Domino 4.5 Professional Reference*, New Riders Publishing (1997); (ii) Krantz, *Building*

2  *Intranets with Lotus Notes & Domino*, Maximum Press (1997).

3        64.    On information and belief, none of the persons involved in the prosecution

4  of the '629 patent, including Mr. McAuley and Mr. Stone, disclosed to the PTO any references

5  identified in Microsoft's Invalidity Contentions or First Amended Invalidity Contentions that

6  pertain to the prior art Paradox 7 technology. Specifically, none of the persons involved in the

7  prosecution of the '629 patent disclosed to the PTO: (i) Karim et al., *Paradox 7 Projects for*

8  *Windows 95*, The Benjamin/Cummings Publishing Company, Inc. (1997); (ii) Weingarten et al.,

9  *Paradox 7 for Windows 95 Illustrated Brief Edition*, CTI (1997).

10        65.    Just as was the case with the 24 prior art references from the Microsoft

11  litigation that the applicants did disclose to the PTO, the narrative and claim charts submitted

12  with Microsoft's Invalidity Contentions and First Amended Invalidity contentions demonstrate

13  how the undisclosed Borland Delphi, Microsoft Visual J++, ASP, Lotus Notes and Domino 4.5,

14  and Paradox 7 prior art references listed in Paragraphs 60-64 above anticipate and/or render

15  obvious the asserted claims in the Microsoft litigation. Therefore, the undisclosed Borland

16  Delphi, Microsoft Visual J++, ASP, Lotus Notes and Domino 4.5, and Paradox 7 prior art

17  references listed in Paragraphs 60-64 above constitute material prior art.

18        66.    The selective disclosure to the PTO of prior art references identified by

19  Microsoft during the Microsoft litigation demonstrates that Mr. McAuley and Mr. Stone were

20  aware of the Microsoft litigation and the existence of material information regarding the

21  patentability of the '629 patent arising out of that litigation.

22        67.    This selective disclosure to the PTO also demonstrates that Mr. McAuley

23  and Mr. Stone made a deliberate decision to withhold material information from the PTO, and

24  thus demonstrates an intent to deceive.

25        68.    The withholding of information material to patentability with intent to

26  deceive constitutes inequitable conduct, which renders the '629 patent unenforceable.

27

28

**COMPLAINT FOR DECLARATORY JUDGMENT**

11

1

## PRAYER FOR RELIEF

2        WHEREFORE, Samsung prays for the following relief:

3           A.    A declaration that Samsung has not infringed and is not infringing, either

4 directly or indirectly, or either literally or under the doctrine of equivalents, any claim of the '744

5 or '629 patent;

6           B.    A declaration that each claim of the '744 and '629 patents is invalid;

7           C.    A declaration that each claim of the '744 and '629 patents is unenforceable.

8           D.    An order that Defendant and each of its officers, employees, agents, alter

9 egos, attorneys, and any persons in active concert or participation with them are restrained and

10 enjoined from further prosecuting or instituting any action against Samsung claiming that either

11 the '744 or '629 patent is valid, enforceable, or infringed, or from representing that Samsung's

12 products or services infringe the '744 patent or the '629 patent;

13           E.    A declaration that this case is exceptional under 35 U.S.C. § 285 and

14 awarding Samsung its attorneys' fees and costs in connection with this case;

15           F.    Such other and further relief as the Court deems just and proper.

16

## DEMAND FOR JURY TRIAL

17        Samsung demands a trial by jury on all issues so triable.

18

19 Dated: January 12, 2011           WEIL, GOTSHAL & MANGES LLP

20

21                       By:   _Steven S. Cherensky_

22                         MATTHEW D. POWERS (Bar No. 104795)
matthew.powers@weil.com

23                         STEVEN S. CHERENSKY (Bar No.168275)
steven.cherensky@weil.com

24                         WEIL, GOTSHAL & MANGES LLP
Silicon Valley Office

25                         201 Redwood Shores Parkway
Redwood Shores, CA 94065

26                         Telephone: (650) 802-3000
Facsimile: (650) 802-3100

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

TIMOTHY DEMASI
tim.demasi@weil.com
STEVEN KALOGERAS
steven.kalogeras@weil.com
JULIAN MOORE
julian.moore@weil.com
WEIL, GOTSHAL & MANGES LLP
New York Office
767 5th Avenue
New York, NY 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Plaintiffs
SAMSUNG ELECTRONICS CO., LTD.
SAMSUNG ELECTRONICS AMERICA,
INC.

**COMPLAINT FOR DECLARATORY JUDGMENT**

13

APP. 158

# EXHIBIT A



US006826744B1

(12) **United States Patent**     (10) **Patent No.:**   **US 6,826,744 B1**

McAuley     (45) **Date of Patent:**   **Nov. 30, 2004**

(54) **SYSTEM AND METHOD FOR GENERATING WEB SITES IN AN ARBITRARY OBJECT FRAMEWORK**

(75) Inventor: **Aubrey McAuley**, Austin, TX (US)

(73) Assignee: **Vertical Computer Systems, Inc.**, Austin, TX (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/410,334**

(22) Filed: **Oct. 1, 1999**

(51) Int. Cl.[7] .................................................. **G06F 9/45**

(52) U.S. Cl. ...................................................... **717/108**

(58) Field of Search .................... 717/108; 707/103 R; 715/522

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 5,544,302 A | * | 8/1996 | Nguyen | 345/837 |
| 5,555,365 A | * | 9/1996 | Selby et al. | 345/765 |
| 5,894,554 A | | 4/1999 | Lowery et al. | 707/104.1 |
| 5,903,894 A | * | 5/1999 | Reneris | 707/100 |
| 5,930,512 A | * | 7/1999 | Boden et al. | 717/102 |
| 5,956,736 A | * | 9/1999 | Hanson et al. | 345/760 |

| | | | | |
|---|---|---|---|---|
| 6,026,433 A | * | 2/2000 | D'Arlach et al. | 707/10 |
| 6,028,998 A | * | 2/2000 | Gloudeman et al. | 717/108 |
| 6,052,670 A | * | 4/2000 | Johnson | 705/27 |
| 6,199,082 B1 | * | 3/2001 | Ferrel et al. | 715/522 |
| 6,219,680 B1 | * | 4/2001 | Bernardo et al. | 707/501.1 |
| 6,226,648 B1 | * | 5/2001 | Appleman et al. | 707/102 |
| 6,247,032 B1 | * | 6/2001 | Bernardo et al. | 345/733 |
| 6,253,282 B1 | * | 6/2001 | Gish | 709/203 |
| 6,308,188 B1 | * | 10/2001 | Bernardo et al. | 707/501.1 |

OTHER PUBLICATIONS

Lewandowski, Framework for Component–Based Client/ Server Computing, Mar. 1998, ACM, pp. 3–27.*

* cited by examiner

*Primary Examiner*—John Chavis

(74) *Attorney, Agent, or Firm*—Brown Raysman Millstein Felder & Steiner LLP

(57) **ABSTRACT**

A system and method for generating computer applications in an arbitrary object framework. The method separates content, form, and function of the computer application so that each may be accessed or modified separately. The method includes creating arbitrary objects, managing the arbitrary objects throughout their life cycle in an object library, and deploying the arbitrary objects in a design framework for use in complex computer applications.

**53 Claims, 2 Drawing Sheets**



**U.S. Patent**         Nov. 30, 2004         Sheet 1 of 2         US 6,826,744 B1



FIG. 1
(PRIOR ART)



FIG. 2



FIG. 3

FIG. 4

**U.S. Patent**     Nov. 30, 2004     Sheet 2 of 2     US 6,826,744 B1



FIG. 5

US 6,826,744 B1

**1**

# SYSTEM AND METHOD FOR GENERATING WEB SITES IN AN ARBITRARY OBJECT FRAMEWORK

## TECHNICAL FIELD OF THE INVENTION

This invention relates generally to systems and methods for generating software applications in an arbitrary object framework, and more specifically to systems and methods for generating web sites in an arbitrary object framework.

## BACKGROUND OF THE INVENTION

Three processes used to create complex software applications such as web sites are form, function, and content. Form includes graphic designs, user interfaces, and graphical representations created by a designer or a group of designers. Function includes logical functionality, which can be software code created by a programmer or group of programmers. Form includes informative content. Informative content can include written, recorded, or illustrated documentation, such as photographs, illustrations, product marketing material, and news articles. Content can be created by writers, photographers, artists, reporters, or editors.

Currently, typical workflows dictate a serial approach to integrating the form, function, and content to create complex software applications such as a web site. The serial approach is illustrated in FIG. 1. In FIG. 1, content 10 for a complex software application can be chosen or created. From 12 for the presentation of content 10 can then be created. Functionality 14 can then be generated using code to create the complex software application (product 16) with the desired information (content 10) and style (form 12). Using the method illustrated in FIG. 1, every final component of the complex software application must be manipulated by a programmer before it is ready to be used. The exact workflow may vary from industry to industry or business to business, but the basic restrictions are generally the same.

A traditional approach such as that illustrated in FIG. 1, may create unwanted bottlenecks in the production process. Each upstream revision, such as a change of content 10 or design 12, forces a repetition of the entire process. As an example, consider a web site for a large newspaper. The web site may have a function that can include a file into the web site. The marketing department may decide to change the appearance of the header on the web site depending on the browser of a user. In this case, a programmer may need to invoke an external script or embed some specific logic within the web site. Unfortunately, if there is a large web site with thousands of pages of information stored on a server, the programmer may have to change every one of the thousands of pages. Therefore, a small change by the marketing department can cause a large burden on the programming department.

Prior art solutions have succeeded in partially separating some of these functions. Notably, content management databases and digital repositories provide a means of separating content from form and function. Likewise, sophisticated software development teams frequently employ internal code structuring techniques that can help to minimize dependencies between interface designs and the functions they access. However, content management tools typically fail to address form/function issues. Therefore, there can still be production slow-downs due to changes in form that require a subsequent change in functionality.

## SUMMARY OF THE INVENTION

Therefore a need exists for a method of generating complex software applications that reduces or eliminates

**2**

production delays and the workload for programmers due to changes in content and/or form. This method should separate form, content and function so that each area can be independently changed.

The present invention provides a system and method for generating software applications that substantially eliminates or reduces disadvantages and problems associated with previously developed systems and methods used for generation of software applications. More specifically, the present invention provides a method for generating software applications in an arbitrary object framework. The method of the present invention separates content, form, and function of the computer application so that each may be accessed or modified independently. The method of this invention includes creating arbitrary objects, managing the arbitrary objects throughout their life cycle, and deploying the arbitrary objects in a design framework for use in complex computer applications.

The present invention provides an important technical advantage in that content, form, and function are separated from each other in the generation of the software application. Therefore, changes in design or content do not require the intervention of a programmer. This advantage decreases the time needed to change various aspects of the software application. Consequently, cost is reduced and versatility is increased.

The present invention provides another technical advantage in that users are not required to use a proprietary language to encode. These arbitrary objects may include encapsulated legacy data, legacy systems and custom programming logic from essentially any source in which they may reside. Any language supported by the host system, or any language that can be interfaced to by the host system, can be used to generate an object within the application.

The present invention provides yet another technical advantage in that it can provide a single point of administrative authority that can reduce security risks. For instance, a large team of programmers can work on developing a large group of arbitrary objects within the object library. If one object has a security hole, an administrator can enter the object library and disable that arbitrary object.

Still another technical advantage of the present invention is that it enables syndication of the software application. As noted above, functionality is separate from form and content. Consequently, a user can easily introduce a new look for the application or syndicate the content and functionality of the application to another group without having to recode all of the objects needed to access content.

Another technical advantage of the present invention is that it allows for personalization and profiling. With personalization, the web presentation is tailored to the specific needs of the web user based on the user's past history. Profiling also enables tailoring a web site or presentation. Profiling is dependent on environmental variables such as browser type or IP address.

## BRIEF DESCRIPTION OF THE DRAWINGS

A more complete understanding of the present invention and the advantages thereof may be acquired by referring to the following description, taken in conjunction with the accompanying drawings in which like reference numbers indicate like features and wherein:

FIG. 1 illustrates a prior art workflow diagram for generating a software product;

FIG. 2 is a hierarchical workflow diagram for one embodiment of the present invention;

US 6,826,744 B1

3

FIG. 3 is a flow diagram for one embodiment of the present invention;

FIG. 4 is a flow diagram for the embodiment illustrated in FIG. 4.

FIG. 5 is a diagram illustrating the components of one embodiment of the present invention used to generate web sites; and

## DETAILED DESCRIPTION OF THE INVENTION

Preferred embodiments of the present invention are illustrated in the FIGUREs, like numerals being used to refer to like and corresponding parts of various drawings.

The present invention provides a system and method for using a hierarchical, arbitrary object framework for generating software applications. The method separates content, form, and function of the software application so that each can be accessed or modified independently. The method of this invention includes creating arbitrary objects, managing the arbitrary objects in an object library, and deploying the arbitrary objects in a design framework for use in computer applications.

FIG. 2 is a hierarchical workflow diagram for the present invention. Product 6 includes three contributing groups: content 10, form 12, and functionality 14. Content 10 can include written, recorded, or illustrated collateral such as documentation, photographic illustrations, product marketing material, and articles. Form 12 can include graphic designs such as user interfaces and graphical presentations. Function 14 can include the logical functionality of software code and scripts. The hierarchical framework separates content 10, form 12, and functionality 14 to generate product 16. Product 16 may be a computer software application such as a web site. Since content 10, design 12, and functionality 14 are separate entities independent of each other, modification in one group does not require corresponding modifications in another group. Each group can contribute to product 16 directly.

FIG. 3 is a flow diagram of one embodiment of the present invention. At step 20, arbitrary objects can be generated. Arbitrary objects may include any combination of application logic and data desired by a developer. Arbitrary objects can include text file pointers, binary file pointers, compiled executables, scripts, data base queries, shell commands, remote procedure calls, global variables, and local variables. The arbitrary object framework allows arbitrary objects to be referenced in a consistent manner regardless of the type of object. Also, the arbitrary object framework allows local arbitrary objects to either override global parent arbitrary objects or inherit capabilities and data from the global parent, regardless of the type of the local arbitrary object.

At step 22, these arbitrary objects can be managed in an object library. The life cycle of these objects may be managed in a consistent manner using revision tracking, roll back, and sign off. At step 24, objects can be deployed from the object library into a design framework to create the software application. Because the object pointers are not tied in any way to the functionality of the object, an object of one type can be easily replaced with another object of another type. This eliminates a common problem in content management systems of the inability to preview content within its appropriate location on the site or within the system. Normally, a special system made for the purpose of previewing a piece of content would have to be hard-coded to view the current approved live content for all other pieces except the piece in question. This multiplies the design

4

problem, because changes in the design in the main site change all previous templates. In the method of the present invention, since all that exists within the framework is an arbitrary object, the arbitrary object can be swapped for another object that pulls the current piece content in question.

Using one embodiment of this invention, for example, the Features or Editorials page of a newspaper can be dynamically replaced. The present invention can execute all the normal objects that can be placed on the page to show the content as it would appear, and then take the one piece in question and replace it with a second object to be examined. Objects may be deployed globally across an entire system or locally within a specific area or sub-areas of a system.

FIG. 4 represents a flow diagram of another embodiment of the present invention. At step 30, arbitrary objects can be generated. At step 32, the arbitrary objects can be managed in an object library. Arbitrary objects can be deployed in a container page at step 34 to generate a web site.

Arbitrary objects may include any combination of application logic and data desired by a developer. Arbitrary objects can include text file pointers, binary file pointers, compiled executable scripts, database queries, shell commands, remote call procedures, global variables and local variables. Arbitrary objects may also include cached data queries and executables. The arbitrary object framework allows arbitrary objects to be referenced in a consistent manner regardless of the type of object. Also, the arbitrary object framework allows local arbitrary objects to either override global parent arbitrary objects or inherit capabilities and data from the global parent arbitrary object.

Arbitrary objects can execute any function that can be run or understood by the host computer system so that any underlying functionality of the operating system used by the host system can be defined as an object within the arbitrary framework. Legacy data, document objects, CPI programs, and database queries can all be encapsulated as objects within the arbitrary framework. The arbitrary object can be accessed by an arbitrary object name. Arbitrary objects are not tied to their functionality. One arbitrary object can be easily replaced with another arbitrary object of another type.

Arbitrary objects can be managed in an object library. The life cycle of the arbitrary objects may be managed in a consistent manner using revision tracking, roll-back, and sign-off. The object library can include separate specialized object libraries that can be administered separately by different developers in each area. For instance, for a web site used to generate a newspaper, there may be an advertising object library that is physically distinguished from other object libraries, such as an object library for sports or an object library for news. Therefore, queries for advertising can be created without impacting any other area of the web site.

Arbitrary objects can be deployed from the object library into a container page to generate the web site. The container page is a truly dynamic page. Unlike prior art methods, where a static copy of information is often pushed over a firewall to a live web site, the present invention incorporates object caching. An arbitrary object can be cached, rather than caching an entire page. When the arbitrary object is cached, certain elements of the arbitrary object can be specified as dynamic elements while others can be specified as static elements. Therefore, a web site can contain multiple dynamic web pages wherein objects used to construct the form, function, and content of the web page can contain dynamic elements and static elements. This provides flex-

US 6,826,744 B1

5

ibility for what needs to be computed or processed at the time that someone, such as a web user, accesses the web page.

FIG. 5 shows the components of one embodiment of the present invention used to generate web sites. A user with web browser 40 can connect to web server 44 through internet or intranet 42. Web server 44 can access static HTML web documents 46 as well as dynamic HTML documents 52. Dynamic HTML web documents 52 can be created using Web OS Object Manager 50. Dynamic HTML Web document 52 can include document objects 56, shell scripts 58, CGI programs 60, and database queries 62. Document objects 56, shell scripts 58, CGI programs 60, and database queries 62 can be stored in WebOS object library 54. Database queries 62 can result from extracting information from WebOS Information Database 68 and inputting the information into Dynamic HTML Web Template 66.

User Profile and Password Database 70 can provide web sites or systems with a means to take advantage of customer profiles to look at customer preferences or history, and dynamically replace a website object with another object that contains content information matching the user profile or preferences. Thus, the web site or system can dynamically allocate the correct content for a customer. This is important in commerce applications. A customer's buying history can be examined for trend items and the customer presented products that match his or her profile. Present personalization systems are written purely in custom code and require an inordinately large amount of time to construct the custom applications necessary to interpret the preferences of an individual user.

The method of present invention can perform object caching. This means that an object can be cached instead of caching an entire page. Object caching permits specifying elements of an object to be dynamic and elements of the object to be static. A system user can thus have the flexibility of specifying what needs to be computed or processed at the time a user accesses the system versus trying to anticipate and calculate in advance and cache and post the object over to a server.

Many functions are stored within an object library on an arbitrary object framework such that those functions can be accessed by name arbitrarily. This is in contrast to a traditional model where the function must be explicitly invoked with all its parameters included. Objects may execute any function that can be run or understood by the host computer system so that any underlying functionality of the host's operating system can be defined as an object within the framework of the method of the present invention. The object library can contain legacy data, document objects, CTI programs, and/or database queries, that can all be encapsulated as objects within a framework and accessed from within a design. All that is needed is the name of the function in order to access the function.

Objects can be controlled to perform functions based on a profile of an individual and environmental variables, such as the type of browser, the country of the individual or the individual's IP address. A specific competitor may be blocked from seeing certain objects on a web page created using the method of the present invention.

A critical distinction between the present invention and previous object oriented development systems is the need to know how a function can be called and what to expect it to return, rather than just knowing the function's name. This means that typically the system administrator calls the name of an object and passes parameters to the object. Any and all

6

variable information or environmental information can be available to every object. The environment space can be available to all objects executed and an object can arbitrarily take advantage of any of the environmental information, depending on the design of the object.

Different areas of a web site can be administered separately by different developers in each of these areas. An advertising object library can be physically distinguished from other object libraries, such as those for sports and news. An advertising programmer can create new queries for the advertising section of a site without having to worry about affecting other areas of the site.

The present invention allows different object types to be interchangeable. The object name is essentially just another variable in the environment. Also different variables can also be interchangeable. The object framework can be designed such that objects and variables can be kept in the same name space, every object can have access to all the environmental settings, and every object pointer can potentially be another name in the name space.

Object caching, rather than page caching can be implemented with the present invention. These objects can be stored in an object library. An object in the object library can be a file, a global variable, an executable script, a database query, a cached executable or a cached database query. This means that the results of a query can be stored in a static file using the object name as long as the static file has not expired. This is important if the query is a lengthy query.

A technical advantage of the present invention is that it allows for syndication. Syndication enables the content and function of a particular web site to be syndicated to another web site or web presentation. For instance, if a company would like to roll out a new look or syndicate its content and functionality to another business, this can be easily accomplished using the present invention. Since there is no application code resident in a web page itself, the same data can be repackaged in a number of different ways across multiple sites. There is no need to recode the design elements or design pages on the web site or recode any functions that are needed to access the content of the website. The present invention enables electronic store fronts to sell from a single source with a unique interface design. Also, newspaper chains can distribute international and national content from a single source and add local content themselves.

Another technical advantage of the present invention is that it allows for a single point of control when developing a web site. Therefore, if a large team of developers are working on a site, and multiple persons are contributing arbitrary objects to the overall arbitrary framework, then if one of the arbitrary objects has a security hole in it, the arbitrary object can be easily accessed in the object library and disabled. This security feature can immediately shut down that function across the entire web site and patch the security hole.

The present invention provides still another technical advantage in that it allows for personalization. Personalization enables companies that want to take advantage of a customer profile to look at the customer's preferences or histories and deploy information to the web site specific to the customer.

Another technical advantage of the present invention allows for profiling. Profiling enables control over the arbitrary objects presented in a web site based on a profile of the individual accessing the web site. Profiling entails determining different environmental variables such as the type of browser hitting the site, the country of the individual access-

US 6,826,744 B1

7

ing the site, and/or the individual's IP address. This can enable a company to present specific information to the individual based on the individual's environmental variables.

Although the present invention has been described in detail herein with reference to the illustrative embodiments, it should be understood that the description is by way of example only and is not to be construed in a limiting sense. It is to be further understood, therefore, that numerous changes in the details of the embodiments of this invention and additional embodiments of this invention will be apparent to, and may be made by, persons of ordinary skill in the art having reference to this description. It is contemplated that all such changes and additional embodiments are within the spirit and true scope of this invention as claimed below.

What is claimed is:

1. A method for generating a computer application on a host system in an arbitrary object framework that separates a content of said computer application, a form of said computer application and a functionality of said computer application, said method comprising:

creating arbitrary objects with corresponding arbitrary names of various object types for generating said content of said computer application, said form of said computer application, and said functionality of said computer application;

managing said arbitrary objects in an object library; and

deploying said arbitrary objects from said object library into a design framework to create said computer application.

2. The method of claim 1, wherein said computer application is a web site.

3. The method of claim 1, wherein said various object types comprise text file pointers.

4. The method of claim 1, wherein said various object types comprise binary file pointers.

5. The method of claim 1, wherein said various object types comprise compiled executables.

6. The method of claim 1, wherein said various object types comprise shell commands.

7. The method of claim 1, wherein said various object types comprise remote procedure calls.

8. The method of claim 1, wherein said various object types comprise global variables.

9. The method of claim 1, wherein said various object types comprise cached executables.

10. The method of claim 1, wherein said various object types comprise cached database queries.

11. The method of claim 1, wherein said various object types comprise local variables.

12. The method of claim 1, wherein said various object types comprise local objects and global parent objects.

13. The method of claim 12, wherein said local objects can override said global parent objects.

14. The method of claim 12, wherein said local objects inherit data from said global parent objects.

15. The method of claim 12, wherein said local objects inherit capabilities from said global parent objects.

16. The method of claim 1, further comprising deploying arbitrary objects globally.

17. The method of claim 1, further comprising deploying arbitrary objects locally.

18. The method of claim 1, wherein the step of managing said arbitrary objects further comprises using revision tracking.

19. The method of claim 1, wherein the step of managing said arbitrary objects further comprises using rollback.

8

20. The method of claim 1, wherein the step managing further comprises using signoff.

21. The method of claim 1, wherein said arbitrary objects can be accessed and deployed into said design framework using said corresponding arbitrary names.

22. The method of claim 1, further comprising swapping an arbitrary object of one type with an arbitrary object of another type.

23. The method of claim 1, further comprising caching objects.

24. The method of claim 23, wherein the step of caching objects further comprises specifying some elements of an arbitrary object to be dynamic elements and specifying some elements of said arbitrary object to be static elements.

25. The method of claim 1, further comprising generating arbitrary objects in a programming language that is compatible or supported by said host system.

26. A method for generating a web site on a host system in an arbitrary object framework that separates a content of said web site, a form of said web site, and a functionality of said web site, said method comprising:

creating arbitrary objects with corresponding arbitrary names of various object types for generating said content of said web site, said form of said web site, and said functionality of said web site; managing said arbitrary objects in an object library; and

deploying said arbitrary objects from said object library to a container page to create said web site.

27. The method of claim 26, wherein said various object types comprise text file pointers.

28. The method of claim 26, wherein said various object types comprise binary file pointers.

29. The method of claim 26, wherein said various object types comprise compiled executables.

30. The method of claim 26, wherein said various object types comprise shell commands.

31. The method of claim 26, wherein said various object types comprise remote procedure calls.

32. The method of claim 26, wherein said various object types comprise global variables.

33. The method of claim 26, wherein said various object types comprise local variables.

34. The method of claim 26, wherein said various object types comprise local objects and global parent objects.

35. The method of claim 34, wherein said local objects can override said global parent objects.

36. The method of claim 34, wherein said local objects inherit data from said global parent objects.

37. The method of claim 34, wherein said local objects inherit capabilities from said global parent objects.

38. The method of claim 26, further comprising deploying arbitrary objects globally.

39. The method of claim 26, further comprising deploying arbitrary objects locally.

40. The method of claim 26, wherein the step of managing said arbitrary objects further comprises using revision tracking.

41. The method of claim 26, wherein the step of managing said arbitrary objects further comprises using rollback.

42. The method of claim 26, wherein the step managing said arbitrary objects further comprises using signoff,.

43. The method of claim 26, wherein said arbitrary objects can be accessed and deployed into said container page using said corresponding arbitrary names.

44. The method of claim 26, further comprising swapping an arbitrary object of one type with an arbitrary object of another type.

US 6,826,744 B1

9

**45**. The method of claim **26**, further comprising caching objects.

**46**. The method of claim **45**, wherein the step of caching objects further comprises specifying some elements of an arbitrary object to be dynamic elements and specifying some elements of said arbitrary object to be static elements.

**47**. The method of claim **26**, further comprising generating arbitrary objects in a programming language that is compatible or supported by said host system.

**48**. The method of claim **26**, wherein said various object types comprise cached executable.

**49**. The method of claim **25**, wherein said various object types comprise cached database queries.

10

**50**. The method of claim **26**, further comprising profiling of a user accessing said web site.

**51**. The method of claim **26**, further comprising personalization of said web site for a user accessing said web site.

**52**. The method of claim **26**, wherein said container page comprises arbitrary objects with both dynamic and static elements.

**53**. The method of claim **26**, wherein said content of said web site and said function of said web site can be syndicated.

*     *     *     *     *

APP. 167

# EXHIBIT B



US007716629B2

## (12) United States Patent
### McAuley

(10) Patent No.: **US 7,716,629 B2**
(45) Date of Patent: **\*May 11, 2010**

(54) **SYSTEM AND METHOD FOR GENERATING WEB SITES IN AN ARBITRARY OBJECT FRAMEWORK**

(75) Inventor: **Aubrey McAuley**, Austin, TX (US)

(73) Assignee: **Vertical Computer Systems, Inc.**, Fort Worth, TX (US)

(\*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 613 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **10/999,911**

(22) Filed: **Nov. 29, 2004**

(65) **Prior Publication Data**

US 2005/0154486 A1    Jul. 14, 2005

**Related U.S. Application Data**

(63) Continuation of application No. 09/410,334, filed on Oct. 1, 1999, now Pat. No. 6,826,744.

(51) **Int. Cl.**
*G06F 9/45*    (2006.01)
(52) **U.S. Cl.** ..................................... 717/100
(58) **Field of Classification Search** ................. 717/106, 717/100, 149
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 5,544,302 A | * | 8/1996 | Nguyen | 715/837 |
| 5,555,365 A | * | 9/1996 | Selby et al. | 715/765 |
| 5,894,554 A | * | 4/1999 | Lowery et al. | 709/203 |
| 5,895,476 A | | 4/1999 | Orr et al. | |
| 5,903,894 A | * | 5/1999 | Reneris | 707/100 |
| 5,930,512 A | * | 7/1999 | Boden et al. | 717/102 |
| 5,956,736 A | * | 9/1999 | Hanson et al. | 715/513 |

| | | | | |
|---|---|---|---|---|
| 6,026,433 A | * | 2/2000 | D'Arlach et al. | 709/217 |
| 6,028,998 A | * | 2/2000 | Gloudeman et al. | 717/108 |
| 6,052,670 A | * | 4/2000 | Johnson | 705/27 |
| 6,199,082 B1 | * | 3/2001 | Ferrel et al. | 715/522 |
| 6,219,680 B1 | * | 4/2001 | Bernardo et al. | 715/501.1 |
| 6,226,648 B1 | * | 5/2001 | Appleman et al. | 707/102 |
| 6,247,032 B1 | * | 6/2001 | Bernardo et al. | 715/530 |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CA | 2110970 | 6/1995 |

OTHER PUBLICATIONS

Adhesive Media, Inc., Dynamic Web Management Tools, WebOS/ NewsFlash/SiteFlash, Assorted Documents, pp. MSVERT002 through MSVERT126.

(Continued)

*Primary Examiner*—John Chavis
(74) *Attorney, Agent, or Firm*—Scheef & Stone, L.L.P.; Jack D. Stone, Jr.

(57) **ABSTRACT**

A method and system for generating a computer application is disclosed. The computer application is generated on a host system in an arbitrary object framework that separates a content of said computer application, a form of said computer application and a functionality of said computer application. Arbitrary objects are created with corresponding arbitrary names of various object types for generating said content of said computer application, said form of said computer application, and said functionality of said computer application. The arbitrary objects are managed in an object library. The arbitrary objects are deployed from said object library into a design framework to create said computer application.

**32 Claims, 2 Drawing Sheets**



GENERATE ARBITRARY OBJECTS — 30

↓

MANAGE ARBITRARY OBJECTS IN AN OBJECT LIBRARY — 32

↓

DEPLOY ARBITRARY OBJECTS IN A CONTAINER PAGE — 34

↓

WEB SITE

APP. 169

**US 7,716,629 B2**

Page 2

### U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 6,253,282 B1 * | 6/2001 | Gish | | 711/113 |
| 6,308,188 B1 * | 10/2001 | Bernardo et al. | | 715/530 |
| 6,553,563 B2 | 4/2003 | Ambrose et al. | | |
| 6,574,635 B2 | 6/2003 | Stauber et al. | | |
| 7,284,191 B1 | 10/2007 | Lindhorst | | |
| 2002/0147805 A1 * | 10/2002 | Leshem et al. | | 709/223 |
| 2002/0161734 A1 | 10/2002 | Stauber et al. | | |

### OTHER PUBLICATIONS

Apple Computer, Inc., Inc., "The WebObjects Dynamic Elements Reference," http://developer.apple.com/ Documentation/ WebObjects/Reference/DynamicElements/DynamicElements.pdf, Jan. 10, 2006, WebObjects and the Enterprise Objects Framework, Chapt. 16.

Banick, et al., "Using Microsoft FrontPage 98," Que Corporation (1998), Microsoft FrontPage, Chapt. 3.

Burke, "Web Databases with Cold Fusion 3," The McGraw-Hill Companies, Inc. (1998), Chapts. 1, 6, 9, and 15.

Buyens, "Running Microsoft FrontPage 98," Microsoft Press, Jim Buyens (1997), Microsoft FrontPage 98, Chapt. 4.

Darnell, et al., Using Macromedia Dreamweaver 1.2, Que (1998), Macromedia Dreamweaver, Chapts. 8 and 12.

Forta, "The ColdFusion 4.0 Web Application Construction Kit," Que (1998), ColdFusion 4.0, Chapts. 10 through 14.

Gray, "Web Publishing with Adobe PageMill 2," Ventana Communications Group, Inc., (1997), Adobe PageMill 1, Chapts. 1 and 3.

Howell, "The Complete Idiot's Guide to Microsoft Visual InterDev," Que Corporation (1997), Microsoft Visual InterDev, Chapt. 4.

Jones, et al.,, "Cascading Style Sheets: A Primer," MIS: Press, Big Tent Media Labs, LLC (1998), Dynamic HTML and Cascading Style Sheets, Chapt. 4.

Martin, et al., "Object-Oriented Methods: A Foundation," P T R Prentice Hall, (1995), Object-Oriented Programming Art, Chapts. 1 through 3.

Meyer, "Object-Oriented Software Construction," 2nd Ed., Prentice Hall PTR, (1997), Object-Oriented Programming Art, Chapt. 2.

Pollizi, "Separating Form from Function: The StarView Experience," Astronomical Data Analysis Software and Systems III, ASP Conference Series, vol. 61, pp. 88-91 (1994).

Prague, et al., "Access 97 Bible," IDG Books Worldwide, Inc. (1997), Microsoft Access 97, Chapts. 1 through 9, (Part 1).

Prague, et al., "Access 97 Bible," IDG Books Worldwide, Inc. (1997), Microsoft Access 97, Chapts. 10 through 18, (Part 2).

Prague, et al., "Access 97 Bible," IDG Books Worldwide, Inc. (1997), Microsoft Access 97, Chapts. 19 through 26, (Part 3).

Prague, et al., "Access 97 Bible," IDG Books Worldwide, Inc. (1997), Microsoft Access 97, Chapts. 27 through 33, and Appendices (Part 4).

Webster, "NetObjects Fusion Handbook," Hayden Books (1996), Webster, NetObjects Fusion, Chapts. 9 through 13.

* cited by examiner

**U.S. Patent**          May 11, 2010          Sheet 1 of 2          US 7,716,629 B2



*FIG. 1*
*(PRIOR ART)*



*FIG. 2*



*FIG. 3*

*FIG. 4*



*FIG. 5*

US 7,716,629 B2

## SYSTEM AND METHOD FOR GENERATING WEB SITES IN AN ARBITRARY OBJECT FRAMEWORK

### RELATED APPLICATIONS

This application is a continuation of U.S. application Ser. No. 09/410,334, filed Oct. 1, 1999, now U.S. Pat. No. 6,826,744.

### TECHNICAL FIELD OF THE INVENTION

This invention relates generally to systems and methods for generating software applications in an arbitrary object framework, and more specifically to systems and methods for generating web sites in an arbitrary object framework.

### BACKGROUND OF THE INVENTION

Three processes used to create complex software applications such as web sites are form, function, and content. Form includes graphic designs, user interfaces, and graphical representations created by a designer or a group of designers. Function includes logical functionality, which can be software code created by a programmer or group of programmers. Form includes informative content. Informative content can include written, recorded, or illustrated documentation, such as photographs, illustrations, product marketing material, and news articles. Content can be created by writers, photographers, artists, reporters, or editors.

Currently, typical workflows dictate a serial approach to integrating the form, function, and content to create complex software applications such as a web site. The serial approach is illustrated in FIG. 1. In FIG. 1, content 10 for a complex software application can be chosen or created. Form 12 for the presentation of content 10 can then be created. Functionality 14 can then be generated using code to create the complex software application (product 16) with the desired information (content 10) and style (form 12). Using the method illustrated in FIG. 1, every final component of the complex software application must be manipulated by a programmer before it is ready to be used. The exact workflow may vary from industry to industry or business to business, but the basic restrictions are generally the same.

A traditional approach such as that illustrated in FIG. 1, may create unwanted bottlenecks in the production process. Each upstream revision, such as a change of content 10 or design 12, forces a repetition of the entire process. As an example, consider a web site for a large newspaper. The web site may have a function that can include a file into the web site. The marketing department may decide to change the appearance of the header on the web site depending on the browser of a user. In this case, a programmer may need to invoke an external script or embed some specific logic within the web site. Unfortunately, if there is a large web site with thousands of pages of information stored on a server, the programmer may have to change every one of the thousands of pages. Therefore, a small change by the marketing department can cause a large burden on the programming department.

Prior art solutions have succeeded in partially separating some of these functions. Notably, content management databases and digital repositories provide a means of separating content from form and function. Likewise, sophisticated software development teams frequently employ internal code structuring techniques that can help to minimize dependencies between interface designs and the functions they access.

However, content management tools typically fail to address form/function issues. Therefore, there can still be production slow-downs due to changes in form that require a subsequent change in functionality.

### SUMMARY OF THE INVENTION

Therefore a need exists for a method of generating complex software applications that reduces or eliminates production delays and the workload for programmers due to changes in content and/or form. This method should separate form, content and function so that each area can be independently changed.

The present invention provides a system and method for generating software applications that substantially eliminates or reduces disadvantages and problems associated with previously developed systems and methods used for generation of software applications. More specifically, the present invention provides a method for generating software applications in an arbitrary object framework. The method of the present invention separates content, form, and function of the computer application so that each may be accessed or modified independently. The method of this invention includes creating arbitrary objects, managing the arbitrary objects throughout their life cycle, and deploying the arbitrary objects in a design framework for use in complex computer applications.

The present invention provides an important technical advantage in that content, form, and function are separated from each other in the generation of the software application. Therefore, changes in design or content do not require the intervention of a programmer. This advantage decreases the time needed to change various aspects of the software application. Consequently, cost is reduced and versatility is increased.

The present invention provides another technical advantage in that users are not required to use a proprietary language to encode. These arbitrary objects may include encapsulated legacy data, legacy systems and custom programming logic from essentially any source in which they may reside. Any language supported by the host system, or any language that can be interfaced to by the host system, can be used to generate an object within the application.

The present invention provides yet another technical advantage in that it can provide a single point of administrative authority that can reduce security risks. For instance, a large team of programmers can work on developing a large group of arbitrary objects within the object library. If one object has a security hole, an administrator can enter the object library and disable that arbitrary object.

Still another technical advantage of the present invention is that it enables syndication of the software application. As noted above, functionality is separate from form and content. Consequently, a user can easily introduce a new look for the application or syndicate the content and functionality of the application to another group without having to recode all of the objects needed to access content.

Another technical advantage of the present invention is that it allows for personalization and profiling. With personalization, the web presentation is tailored to the specific needs of the web user based on the user's past history. Profiling also enables tailoring a web site or presentation. Profiling is dependent on environmental variables such as browser type or IP address.

### BRIEF DESCRIPTION OF THE DRAWINGS

A more complete understanding of the present invention and the advantages thereof may be acquired by referring to

US 7,716,629 B2

3

the following description, taken in conjunction with the accompanying drawings in which like reference numbers indicate like features and wherein:

FIG. 1 illustrates a prior art workflow diagram for generating a software product;

FIG. 2 is a hierarchical workflow diagram for one embodiment of the present invention;

FIG. 3 is a flow diagram for one embodiment of the present invention;

FIG. 4 is a flow diagram for another embodiment of the present invention; and

FIG. 5 is a diagram illustrating the components of one environment of the present invention used to generate web sites.

## DETAILED DESCRIPTION OF THE INVENTION

Preferred embodiments of the present invention are illustrated in the FIGUREs, like numerals being used to refer to like and corresponding parts of various drawings.

The present invention provides a system and method for using a hierarchical, arbitrary object framework for generating software applications. The method separates content, form, and function of the software application so that each can be accessed or modified independently. The method of this invention includes creating arbitrary objects, managing the arbitrary objects in an object library, and deploying the arbitrary objects in a design framework for use in computer applications.

FIG. 2 is a hierarchical workflow diagram for the present invention. Product 16 includes three contributing groups: content 10, form 12, and functionality 14. Content 10 can include written, recorded, or illustrated collateral such as documentation, photographic illustrations, product marketing material, and articles. Form 12 can include graphic designs such as user interfaces and graphical presentations. Function 14 can include the logical functionality of software code and scripts. The hierarchical framework separates content 10, form 12, and functionality 14 to generate product 16. Product 16 may be a computer software application such as a a web site. Since content 10, design 12, and functionality 14 are separate entities independent of each other, modification in one group does not require corresponding modifications in another group. Each group can contribute to product 16 directly.

FIG. 3 is a flow diagram of one embodiment of the present invention. At step 20, arbitrary objects can be generated. Arbitrary objects may include any combination of application logic and data desired by a developer. Arbitrary objects can include text file pointers, binary file pointers, compiled executables, scripts, data base queries, shell commands, remote procedure calls, global variables, and local variables. The arbitrary object framework allows arbitrary objects to be referenced in a consistent manner regardless of the type. Also, the arbitrary object framework allows local arbitrary objects to either override global parent arbitrary objects or inherit capabilities and data from the global parent, regardless of the type of the local arbitrary object.

At step 22, these arbitrary objects can be managed in an object library. The life cycle of these objects may be managed in a consistent manner using revision tracking, roll back, and sign off. At step 24, objects can be deployed from the object library into a design framework to create the software application. Because the object pointers are not tied in any way to the functionality of the object, an object of one type can be easily replaced with another object of another type. This eliminates a common problem in content management systems of the inability to preview content within its appropriate location on the site or within the system. Normally, a special system made for the purpose of previewing a piece of content would have to be hard-coded to view the current approved live content for all other pieces except the piece in question. This multiplies the design problem, because changes in the design in the main site change all previous templates. In the method of the present invention, since all that exists within the framework is an arbitrary object, the arbitrary object can be swapped for another object that pulls the current piece content in question.

Using one embodiment of this invention, for example, the Features or Editorials page of a newspaper can be dynamically replaced. The present invention can execute all the normal objects that can be placed on the page to show the content as it would appear, and then take the one piece in question and replace it with a second object to be examined. Objects may be deployed globally across an entire system or locally within a specific area or sub-areas of a system.

FIG. 4 represents a flow diagram of another embodiment of the present invention. At step 30, arbitrary objects can be generated. At step 32, the arbitrary objects can be managed in an object library. Arbitrary objects can be deployed in a container page at step 34 to generate a web site.

Arbitrary objects may include any combination of application logic and data desired by a developer. Arbitrary objects can include text file pointers, binary file pointers, compiled executable scripts, database queries, shell commands, remote call procedures, global variables and local variables. Arbitrary objects may also include cached data queries and executables. The arbitrary object framework allows arbitrary objects to be referenced in a consistent manner regardless of the type of object. Also, the arbitrary object framework allows local arbitrary objects to either override global parent arbitrary objects or inherit capabilities and data from the global parent arbitrary object.

Arbitrary objects can execute any function that can be run or understood by the host computer system so that any underlying functionality of the operating system used by the host system can be defined as an object within the arbitrary framework. Legacy data, document objects, CGI programs, and database queries can all be encapsulated as objects within the arbitrary framework. The arbitrary object can be accessed by an arbitrary object name. Arbitrary objects are not tied to their functionality. One arbitrary object can be easily replaced with another arbitrary object of another type.

Arbitrary objects can be managed in an object library. The life cycle of the arbitrary objects may be managed in a consistent manner using revision tracking, roll-back, and sign-off. The object library can include separate specialized object libraries that can be administered separately by different developers in each area. For instance, for a web site used to generate a newspaper, there may be an advertising object library that is physically distinguished from other object libraries, such as an object library for sports or an object library for news. Therefore, queries for advertising can be created without impacting any other area of the web site.

Arbitrary objects can be deployed from the object library into a container page to generate the web site. The container page is a truly dynamic page. Unlike prior art methods, where a static copy of information is often pushed over a firewall to a live web site, the present invention incorporates object caching. An arbitrary object can be cached, rather than caching an entire page. When the arbitrary object is cached, certain elements of the arbitrary object can be specified as dynamic elements while others can be specified as static elements. Therefore, a web site can contain multiple dynamic

US 7,716,629 B2

5

web pages wherein objects used to construct the form, function, and content of the web page can contain dynamic elements and static elements. This provides flexibility for what needs to be computed or processed at the time that someone, such as a web user, accesses the web page.

FIG. 5 shows the components of one environment of the present invention used to generate web sites. A user with web browser **40** can connect to web server **44** through internet or intranet **42**. Web server **44** can access static HTML web documents **46** as well as dynamic HTML documents **52**. Dynamic HTML web documents **52** can be created using WebOS Object Manager **50**. Dynamic HTML Web document **52** can include document objects **56**, shell scripts **58**, CGI programs **60**, and database queries **62**. Document objects **56**, shell scripts **58**, CGI programs **60**, and database queries **62** can be stored in WebOS object library **54**. Database queries **62** can result from extracting information from WebOS Information Database **68** and inputting the information into Dynamic HTML Web Template **66**.

User Profile and Password Database **70** can provide web sites or systems with a means to take advantage of customer profiles to look at customer preferences or history, and dynamically replace a website object with another object that contains content information matching the user profile or preferences. Thus, the web site or system can dynamically allocate the correct content for a customer. This is important in e-commerce applications. A customer's buying history can be examined for trend items and the customer presented products that match his or her profile. Present personalization systems are written purely in custom code and require an inordinately large amount of time to construct the custom applications necessary to interpret the preferences of an individual user.

The method of present invention can perform object caching. This means that an object can be cached instead of caching an entire page. Object caching permits specifying elements of an object to be dynamic and elements of the object to be static. A system user can thus have the flexibility of specifying what needs to be computed or processed at the time a user accesses the system versus trying to anticipate and calculate in advance and cache and post the object over to a server.

Many functions are stored within an object library on an arbitrary object framework such that those functions can be accessed by name arbitrarily. This is in contrast to a traditional model where the function must be explicitly invoked with all its parameters included. Objects may execute any function that can be run or understood by the host computer system so that any underlying functionality of the host's operating system can be defined as an object within the framework of the method of the present invention. The object library can contain legacy data, document objects, CGI programs, and/or database queries, that can all be encapsulated as objects within a framework and accessed from within a design. All that is needed is the name of the function in order to access the function.

Objects can be controlled to perform functions based on a profile of an individual and environmental variables, such as the type of browser, the country of the individual or the individual's IP address. A specific competitor may be blocked from seeing certain objects on a web page created using the method of the present invention.

A critical distinction between the present invention and previous object oriented development systems is the need to know how a function can be called and what to expect it to return, rather than just knowing the function's name. This means that typically the system administrator calls the name

6

of an object and passes parameters to the object. Any and all variable information or environmental information can be available to every object. The environment space can be available to all objects executed and an object can arbitrarily take advantage of any of the environmental information, depending on the design of the object.

Different areas of a web site can be administered separately by different developers in each of these areas. An advertising object library can be physically distinguished from other object libraries, such as those for sports and news. An advertising programmer can create new queries for the advertising section of a site without having to worry about affecting other areas of the site.

The present invention allows different object types to be interchangeable. The object name is essentially just another variable in the environment. Also different variables can also be interchangeable. The object framework can be designed such that objects and variables can be kept in the same name space, every object can have access to all the environmental settings, and every object pointer can potentially be another name in the name space.

Object caching, rather than page caching can be implemented with the present invention. These objects can be stored in an object library. An object in the object library can be a file, a global variable, an executable script, a database query, a cached executable or a cached database query. This means that the results of a query can be stored in a static file using the object name as long as the static file has not expired. This is important if the query is a lengthy query.

A technical advantage of the present invention is that it allows for syndication. Syndication enables the content and function of a particular web site to be syndicated to another web site or web presentation. For instance, if a company would like to roll out a new look or syndicate its content and functionality to another business, this can be easily accomplished using the present invention. Since there is no application code resident in a web page itself, the same data can be repackaged in a number of different ways across multiple sites. There is no need to recode the design elements or design pages on the web site or recode any functions that are needed to access the content of the website. The present invention enables electronic store fronts to sell from a single source with a unique interface design. Also, newspaper chains can distribute international and national content from a single source and add local content themselves.

Another technical advantage of the present invention is that it allows for a single point of control when developing a web site. Therefore, if a large team of developers are working on a site, and multiple persons are contributing arbitrary objects to the overall arbitrary framework, then if one of the arbitrary objects has a security hole in it, the arbitrary object can be easily accessed in the object library and disabled. This security feature can immediately shut down that function across the entire web site and patch the security hole.

The present invention provides still another technical advantage in that it allows for personalization. Personalization enables companies that want to take advantage of a customer profile to look at the customer's preferences or histories and deploy information to the web site specific to the customer.

Another technical advantage of the present invention allows for profiling. Profiling enables control over the arbitrary objects presented in a web site based on a profile of the individual accessing the web site. Profiling entails determining different environmental variables such as the type of browser hitting the site, the country of the individual accessing the site, and/or the individual's IP address. This can

US 7,716,629 B2

7

enable a company to present specific information to the individual based on the individual's environmental variables.

Although the present invention has been described in detail herein with reference to the illustrative embodiments, it should be understood that the description is by way of example only and is not to be construed in a limiting sense. It is to be further understood, therefore, that numerous changes in the details of the embodiments of this invention and additional embodiments of this invention will be apparent to, and may be made by, persons of ordinary skill in the art having reference to this description. It is contemplated that all such changes and additional embodiments are within the spirit and true scope of this invention as claimed below.

The invention claimed is:

1. A system for generating a computer application on a host system in an arbitrary object framework that separates a content of said computer application, a form of said computer application, and a functionality of said computer application, said system including a computer comprising a processor and a memory operably coupled to said processor, said memory being configured for storing a computer program executable by said processor, said computer program comprising:

a first set of executable instructions for creating arbitrary objects with corresponding arbitrary names of content objects used in generating said content of said computer application, form objects used in defining said form of said computer application, and function objects used in executing said functionality of said computer application each arbitrary object being separate from each other arbitrary object;

a second set of executable instructions for managing said arbitrary objects in an arbitrary object library; and

a third set of executable instructions for deploying said arbitrary objects from said arbitrary object library into a design framework to create said computer application.

2. The system of claim 1, wherein said computer application is a web site.

3. The system of claim 1, wherein each of said various object types include a type selected from the group consisting of: text file pointers; binary file pointers; compiled executables; shell commands; remote procedure calls; global variables; cached executables; cached database queries; local variables; and local objects and global parent objects, wherein said local objects are capable of overriding said global parent objects, and wherein said local objects are capable of inheriting data from said global parent objects.

4. The system of claim 1, wherein the third set of executable instructions are for deploying arbitrary objects locally.

5. The system of claim 1, wherein the second set of executable instructions for managing said arbitrary objects further comprises executable instructions for revision tracking.

6. The system of claim 1, wherein the second set of executable instructions for managing said arbitrary objects further comprises executable instructions for using rollback.

7. The system of claim 1, wherein the second set of executable instructions for managing said arbitrary objects further comprises executable instructions for using signoff.

8. The system of claim 1, wherein the third set of exectable instructions include instructions to access and deploy arbitrary objects into said design framework using said corresponding arbitrary names.

9. The system of claim 1, further comprising executable instructions for swapping an arbitrary object of one type with an arbitrary object of another type.

10. The system of claim 1, further comprising executable instructions for caching objects.

8

11. The system of claim 10, wherein the executable instructions for caching objects further comprises executable instructions for specifying some elements of an arbitrary object to be dynamic elements and specifying some elements of said arbitrary object to be static elements.

12. The system of claim 1, further comprising executable instructions for generating arbitrary objects in a programming language that is compatible and supported by said host system.

13. A system for generating a web site on a host system in an arbitrary object framework that separates a content of said web site, a form of said web site, and a functionality of said web site, said system including a computer comprising a processor and a memory operably coupled to said processor, said memory being configured for storing a computer program executable by said processor, said computer program comprising:

a first set of executable instructions for creating arbitrary objects with corresponding arbitrary names of content objects used in generating said content of said web site, form objects used in defining said form of said web site, and function objects used in executing said functionality of said web site, each arbitrary object being separate from each other arbitrary object;

a second set of executable instructions for managing said arbitrary objects in an arbitrary object library; and

a third set of executable instructions for deploying said arbitrary objects from said arbitrary object library to a container page to create said web site.

14. The system of claim 13, wherein each of said various object types include a type selected from the group consisting of: text file pointers; binary file pointers; compiled executables; shell commands; remote procedure calls; global variables; cached executables; cached database queries; local variables; and local objects and global parent objects, wherein said local objects are capable of overriding said global parent objects, and wherein said local objects are capable of inheriting data from said global parent objects.

15. The system of claim 13, wherein the third set of executable instructions are for deploying arbitrary objects locally.

16. The system of claim 13, wherein the second set of executable instructions for managing said arbitrary objects further comprises executable instructions for revision tracking.

17. The system of claim 13, wherein the second set of executable instructions for managing said arbitrary objects further comprises executable instructions for using rollback.

18. The system of claim 13, wherein the second set of executable instructions for managing said arbitrary objects further comprises executable instructions for using signoff.

19. The system of claim 13, wherein the third set of executable instructions include instructions to access and deploy arbitrary objects into said design framework using said corresponding arbitrary names.

20. The system of claim 19, wherein the third set of executable instructions is capable of accessing and deploying the arbitrary objects into said container page using said corresponding arbitrary names.

21. A system for generating a computer application on a host system in an arbitrary object framework that separates a content of said computer application, a form of said computer application, and a functionality of said computer application, said system including a computer comprising a processor and a memory operably coupled to said processor, said memory being configured for storing a computer program executable by said processor, said computer program comprising:

US 7,716,629 B2

9

a first set of executable instructions for creating arbitrary objects with corresponding arbitrary names of content objects used in generating said content of said computer application, form objects used in defining said form of said computer application, and function objects used in executing said functionality of said computer application, each arbitrary object being callable by name only, each arbitrary object being independently modifiable without corresponding modifications being made to any other arbitrary object, and each arbitrary object further being interchangable with other arbitrary objects;

a second set of executable instructions for managing said arbitrary objects in an arbitrary object library; and

a third set of executable instructions for deploying said arbitrary objects from said arbitrary object library into a design framework to create said computer application.

**22.** The system of claim **21**, wherein said computer application is a web site.

**23.** The system of claim **21**, wherein each of said various object types include a type selected from the group consisting of: text file pointers; binary file pointers; compiled executables; shell commands; remote procedure calls; global variables; cached executables; cached database queries; local variables; and local objects and global parent objects, wherein said local objects are capable of overriding said global parent objects, and wherein said local objects are capable of inheriting data from said global parent objects.

**24.** The system of claim **21**, wherein the third set of executable instructions are for deploying arbitrary objects locally.

10

**25.** The system of claim **21**, wherein the second set of executable instructions for managing said arbitrary objects further comprises executable instructions for revision tracking.

**26.** The system of claim **21**, wherein the second set of executable instructions for managing said arbitrary objects further comprises executable instructions for using rollback.

**27.** The system of claim **21**, wherein the second set of executable instructions for managing said arbitrary objects further comprises executable instructions for using signoff.

**28.** The system of claim **21**, wherein the third set of executable instructions include instructions to access and deploy arbitrary objects into said design framework using said corresponding arbitrary names.

**29.** The system of claim **21**, further comprising executable instructions for swapping an arbitrary object of one type with an arbitrary object of another type.

**30.** The system of claim **21**, further comprising executable instructions for caching objects.

**31.** The system of claim **30**, wherein the executable instructions for caching objects further comprises exectable instructions for specifying some elements of an arbitrary object to be dynamic elements and specifying some elements of said arbitrary object to be static elements.

**32.** The system of claim **21**, further comprising executable instructions for generating arbitrary objects in a programming language that is compatible and supported by said host system.

* * * * *

# EXHIBIT C



Products   Services   Support   Success Stories
Portfolio   Demos   Inquire   Adhesive Media



**[Products] [Services] [Support] [Portfolio] [Demos]**
**[Inquire] [Success Stories] [Adhesive Media]**

**Powered by**



Send mail to webmaster@adhesive.com with questions or comments about this web site.

Copyright 1996 by Adhesive Media, Inc.
Last modified: October 15, 1996

EXHIBIT K

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| VERTICAL COMPUTER SYSTEMS, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | Civil Action No.  2:10-cv-490 |
| v. | § | |
| | § | **JURY TRIAL DEMANDED** |
| INTERWOVEN, INC., | § | |
| LG ELECTRONICS MOBILECOMM | § | |
| U.S.A., INC., LG ELECTRONICS | § | |
| INC., SAMSUNG ELECTRONICS CO., | § | |
| LTD., SAMSUNG ELECTRONICS | § | |
| AMERICA, INC., | § | |
| | § | |
| Defendants. | § | |

## COMPLAINT

Plaintiff, Vertical Computer Systems, Inc. ("Vertical") brings this action against

Defendant Interwoven, Inc. ("Interwoven"), LG Electronics MobileComm U.S.A., INC., LG

Electronics Inc., Samsung Electronics Co., Ltd. and Samsung Electronics America, Inc.

(collectively, "defendants"), alleging as follows:

## PARTIES

1.      Plaintiff Vertical is a Delaware corporation with a principal place of business in

Richardson, Texas.

2.      Defendant Interwoven is a Delaware corporation and has its principal place of

business at 160 East Tasman Drive, San Jose, California.  Interwoven is doing business in this

judicial district and may be served with process through its Registered Agent, Dona Niemeyer

located at 2730 Gateway Oaks Drive, Suite 100, Sacramento, California 95833-3503.

3.      Defendant LG Electronics MobileComm U.S.A., Inc. is a California corporation

and has its principal place of business at 1000 Sylvan Avenue, Englewood Cliffs, NJ 07632.  LG

Electronics MobileComm U.S.A., Inc. is doing business in this judicial district and may be served with process through its Registered Agent, Alan K. Tse, 10101 Old Grove Road, San Diego, CA  92131.

4.      LG Electronics Inc. is a corporation organized under the laws of the Republic of Korea and has its principal place of business at LG Twin Towers 20, Yeouido dong, Yeongdeungpo-gu, Seoul, Republic of Korea 150-721.

5.      Samsung Electronics America, Inc. is a New York corporation and has its principal place of business at 85 Challenger Road, Ridgefield Park, NJ  07660.  Samsung is doing business in this judicial district and may be served with process through its Registered Agent, CT Corporation System, 111 Eighth Avenue, New York, NY  10011.

6.      Samsung Electronics Co., Ltd. is a corporation organized under the laws of the Republic of Korea and has its principal place of business at 1320-10, Seocho 2-dong, Seocho-gu, Seoul 137-857, Republic of Korea.

## JURSIDICTION AND VENUE

7.      Vertical's patent infringement action arises under the patent laws of the United States, including 35 U.S.C. §§ 271 and 281.  This Court has exclusive subject matter jurisdiction over this civil action under 28 U.S.C. § 1338(a).

8.      Interwoven has minimum contacts with the Marshall Division of the Eastern District of Texas such that this venue is a fair and reasonable one.  Interwoven has committed such purposeful acts and/or transactions in Texas that it reasonably knew and expected would result in it being brought into a Texas court as a consequence of its business activities.  For these reasons, venue is proper in this Court under 28 U.S.C. §§ 1391(b) and (c) and 28 U.S.C. § 1400(b).

APP. 183

9.      LG Electronics MobileComm U.S.A., Inc. and LG Electronics Inc. (collectively, "LG") have minimum contacts with the Marshall Division of the Eastern District of Texas such that this venue is a fair and reasonable one.  LG has committed such purposeful acts and/or transactions in Texas that it reasonably knew and expected would result in it being brought into a Texas court as a consequence of its business activities.  For these reasons, venue is proper in this Court under 28 U.S.C. §§ 1391(b) and (c) and 28 U.S.C. § 1400(b).

10.     Samsung Electronics Co., Ltd. and Samsung Electronics America, Inc. (collectively, "Samsung") have minimum contacts with the Marshall Division of the Eastern District of Texas such that this venue is a fair and reasonable one.  Samsung has committed such purposeful acts and/or transactions in Texas that it reasonably knew and expected would result in it being brought into a Texas court as a consequence of its business activities.  For these reasons, venue is proper in this Court under 28 U.S.C. §§ 1391(b) and (c) and 28 U.S.C. § 1400(b).

## PATENT INFRINGEMENT

11.     On November 30, 2004, United States Patent No. 6,826,744 (the "'744 patent") was duly and legally issued for a "System and Method for Generating Web Sites in an Arbitrary Object Framework."

12.     On May 11, 2010, United States Patent No. 7,716,629 (the "'629 patent") was duly and legally issued for a "System and Method for Generating Web Sites in an Arbitrary Object Framework."

13.     Vertical is the owner of the '744 and '629 patents and has standing to sue for infringement.

14.     Interwoven manufactures, has made, uses, sells and/or offers for sale software such as the Interwoven TeamSite 2006 product that, when used, is covered by at least claims 1-

APP. 184

11, 18-19, 21, 23-33, 40-41 and 45-53 of the '744 patent and 1-6, 8-17, 19-26 and 28-32 of the '629 patent. Interwoven has also induced others to infringe and/or has contributorily infringed those claims of the '744 and '629 patents.

15.     Defendants LG and Samsung manufacture, have made, use, import, sell and/or offer for sale cellular telephones covered by at least one claim of each of the '744 and '629 patents. Defendants LG and Samsung have also infringed and continue to infringe the '744 and '629 patents by actively inducing others to infringe with specific intent and by contributing to the infringement by others by the use, sale and/or offer for sale of the infringing cellular telephones. The infringement that has occurred is at least one of the following claims through commercialization of at least the following model phones:

| | Claims of '744 Patent | Claims of '629 Patent | Model Nos. |
|---|---|---|---|
| LG | 1,3,4,5,9,17,21, 23,25 | 1,4,8,10,12,21,24, 28,30,32 | Ally™ VS740 |
| Samsung | 1,3,4,5,9,17,21, 23,25 | 1,4,8,10,12,21,24, 28,30,32 | Galaxy Tab™ Tablet Computer<br>Galaxy Captivate™ Android Phone<br>Galaxy Fascinate™ Android Phone<br>Galaxy Epic™ Android Phone<br>Samsung Galaxy Mesmerize™<br>i500 Touch Screen Cell Phone |

## STATUTORY NOTICE

16.     Vertical has placed the required statutory notice on all software products sold by it under the '744 and '629 patents.

## WILLFUL INFRINGEMENT

17.     Vertical has given written notice to Interwoven of the '744 patent by a letter dated January 12, 2009 and since that time, Interwoven has been willfully infringing the '744 patent.

APP. 185

18.     In a meeting between Interwoven and Vertical personnel held on March 5, 2009 in San Jose, California, Interwoven intentionally concealed its infringement of the '744 patent.

19.     Vertical has given written notice to Interwoven of the '629 patent by a letter dated August 12, 2010 and since that time, Interwoven has been willfully infringing the '629 patent.

20.     Interwoven again mislead Vertical into believing that it would attempt to resolve any patent infringement claim by Vertical by negotiating in good faith, but it obtained an extension of time under the pretext of studying the issues presented by Vertical to prepare a lawsuit against Vertical.

## **RELIEF**

21.     Vertical has been damaged as a result of Interwoven's, LG's and Samsung's infringing conduct and LG, Samsung and Interwoven are, thus, liable to Vertical in an amount that adequately compensates Vertical for LG's, Samsung's and Interwoven's infringement, which, by law, cannot be less than a reasonable royalty for each of these three defendants.

22.     LG, Samsung and Interwoven will continue their infringement of the '744 and '629 patents unless enjoined by the Court.  LG's, Samsung's and Interwoven's infringing conduct causes Vertical irreparable harm and will continue to cause such harm without the issuance of an injunction.

## **JURY DEMAND**

23.     Vertical hereby requests a trial by jury pursuant to Rule 38 of the Federal Rules of Civil Procedure.

## **PRAYER FOR RELIEF**

Vertical respectfully requests that the Court find in its favor and against LG, Samsung and Interwoven and that the Court grant Vertical the following relief:

APP. 186

a. Judgment that one or more claims of United States Patent No. 6,826,744 and United States Patent No. 7,716,629 have been infringed, either literally and/or under the doctrine of equivalents, by LG, Samsung and Interwoven and/or by others to whose infringement LG, Samsung and Interwoven have contributed and/or by others whose infringement has been induced by LG, Samsung and Interwoven;

b. Judgment that Interwoven, LG and Samsung account for and pay to Vertical all damages to and costs incurred by Vertical because of Interwoven, LG and Samsung's infringing activities and other conduct complained of herein;

c. That Vertical be granted pre-judgment and post-judgment interest on the damages caused to it by reason of Interwoven's infringing activities and other conduct complained of herein;

d. That this Court declare this an exceptional case and award Vertical its reasonable attorneys' fees and costs in accordance with 28 U.S.C. § 285;

e. That Interwoven's infringement be found willful and that the Court award increased damages of three times the actual damages awarded;

f. That Interwoven, LG and Samsung be permanently enjoined from any further activity or conduct that infringes any claims of United

APP. 187

States Patent No. 6,824,744 and United States Patent No. 7,716,629; and

g.      That Vertical be granted such other and further relief as the Court or jury may deem just and proper under the circumstances.

Respectfully submitted,

Dated: November 15, 2010            VERTICAL COMPUTER SYSTEMS, INC.

/s/ Lu Pham
Lu Pham
State Bar No. 15895430
**Lynn Pham & Ross, LLP**
306 W. Broadway Avenue
Fort Worth, Texas 76104
Telephone:  (817) 332-8505
Facsimile:  (817) 332-8548
pham@laborcounsel.net

**ATTORNEY FOR PLAINTIFF**
**VERTICAL COMPUTER SYSTEMS, INC.**

EXHIBIT L

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | | |
|---|---|---|
| VERTICAL COMPUTER SYSTEMS, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 2:10-CV-490 TJW |
| | § | |
| INTERWOVEN, INC., LG ELECTRONICS | § | |
| MOBILECOMM U.S.A., INC., LG | § | |
| ELECTRONICS INC., SAMSUNG | § | |
| ELECTRONICS CO., LTD., SAMSUNG | § | |
| ELECTRONICS AMERICA, INC., | § | |
| | § | |
| Defendants. | § | |
| | § | |

**DEFENDANTS SAMSUNG ELECTRONICS CO. LTD, AND SAMSUNG
ELECTRONICS AMERICA, INC.'S
ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS**

Defendants Samsung Electronics Co., Ltd. and Samsung Electronics America, Inc. (collectively "Samsung") respond to the Complaint of Plaintiff Vertical Computer Systems, Inc. ("Vertical") as follows:

**PARTIES**

1.      Samsung lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 1 of the Complaint, and therefore denies them.

2.      Paragraph 2 does not require a response by Samsung.   To the extent a response is deemed required, Samsung lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 2 of the Complaint, and therefore denies them.

3.      Paragraph 3 does not require a response by Samsung.   To the extent a response is deemed required, Samsung lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 3 of the Complaint, and therefore denies them.

4.      Paragraph 4 does not require a response by Samsung.   To the extent a response is deemed required, Samsung lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 4 of the Complaint, and therefore denies them.

5.      Samsung denies the allegations contained in Paragraph 5 of the Complaint, except to admit that Samsung Electronics America, Inc. is a New York corporation and has its principal place of business at 85 Challenger Road, Ridgefield Park, NJ 07660.

6.      Samsung admits the allegations contained in Paragraph 6 of the Complaint.

**JURISDICTION AND VENUE**

7.      Samsung denies the allegations contained in Paragraph 7 of the Complaint, except to admit that this action purports to state claims of patent infringement that arise under the patent laws of the United States, 35 U.S.C. §§ 101 et seq.

8.      Paragraph 8 does not require a response by Samsung.   To the extent a response is deemed required, Samsung lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 8 of the Complaint, and therefore denies them.

9.      Paragraph 9 does not require a response by Samsung.   To the extent a response is deemed required, Samsung lacks knowledge or information sufficient to form a belief

as to the truth of the allegations contained in Paragraph 9 of the Complaint, and therefore denies them.

10.      Samsung denies the allegations of Paragraph 10, except to admit that Vertical alleges that venue is proper in this court under 28 U.S.C. § 1391(b) and (c), and 28 U.S.C. § 1400(b).

## PURPORTED PATENT INFRINGEMENT

11.      Samsung denies the allegations of Paragraph 11 of the Complaint, except to admit that U.S. Patent No. 6,826,744 ("the '744 patent") states on its face that it is entitled "System and Method for Generating Web Sites in an Arbitrary Object Framework," and that it was issued on November 30, 2004.

12.      Samsung denies the allegations of Paragraph 12 of the Complaint, except to admit that U.S. Patent No. 7,716,629 ("the '629 patent") states on its face that it is entitled "System and Method for Generating Web Sites in an Arbitrary Object Framework," and that it was issued on May 11, 2010.

13.      Samsung lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 13 of the Complaint, and therefore denies them.

14.      Paragraph 14 does not require a response by Samsung.   To the extent a response is deemed required, Samsung lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 14 of the Complaint, and therefore denies them.

15.      Samsung denies the allegations in Paragraph 15 of the Complaint.

APP. 192

**PURPORTED STATUTORY NOTICE**

16.      Samsung lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 16 of the Complaint, and therefore denies them.

**PURPORTED WILLFUL INFRINGEMENT**

17.      Paragraph 17 does not require a response by Samsung.   To the extent a response is deemed required, Samsung lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 17 of the Complaint, and therefore denies them.

18.      Paragraph 18 does not require a response by Samsung.   To the extent a response is deemed required, Samsung lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 18 of the Complaint, and therefore denies them.

19.      Paragraph 19 does not require a response by Samsung.   To the extent a response is deemed required, Samsung lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 19 of the Complaint, and therefore denies them.

20.      Paragraph 20 does not require a response by Samsung.   To the extent a response is deemed required, Samsung lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 20 of the Complaint, and therefore denies them.

APP. 193

## PURPORTED RELIEF

21.     Samsung denies the allegations of Paragraph 21 of the Complaint concerning Samsung.   Samsung lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 21 of the Complaint, and therefore denies them.

22.     Samsung denies the allegations of Paragraph 22 of the Complaint concerning Samsung.   Samsung lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 22 of the Complaint, and therefore denies them.

## JURY DEMAND

23.     To the extent that a response is required, Samsung admits that Vertical's Complaint contains a request for a jury trial.

## DENIAL OF VERTICAL'S PRAYER FOR RELIEF

24.     Samsung requests that the Court deny Vertical all relief requested by Vertical in its Prayer for Relief.

## AFFIRMATIVE DEFENSES

25.     Samsung asserts the defenses set out below, and expressly reserves the right to amend their Answer with additional defenses.

## FIRST AFFIRMATIVE DEFENSE
### (Failure to State a Claim)

26.     Vertical's Complaint fails to state a claim upon which relief can be granted.

5

## SECOND AFFIRMATIVE DEFENSE
### (Non-Infringement)

27.      Samsung does not infringe and has not infringed, either directly,

indirectly, contributorily, or by inducement, any claim of the '744 or '629 patents (collectively,

the "Asserted Patents"), either literally or under the doctrine of equivalents, willfully or

otherwise.

## THIRD AFFIRMATIVE DEFENSE
### (Invalidity)

28.      The claims of the Asserted Patents are invalid for failure to comply with

one or more requirements of the Patent Laws of the United States, 35 U.S.C. § 100 et seq.,

including without limitation §§ 102, 103 and 112.

## FOURTH AFFIRMATIVE DEFENSE
### (Claim Construction Estoppel)

29.      Vertical is estopped from construing the claims of the Asserted Patents to

cover any Samsung product because representations, omissions, and/or concessions made during

prosecution of the Asserted Patents, and/or related U.S. or foreign patents and patent

applications, limit the scope of the claims of the Asserted Patents.

## FIFTH AFFIRMATIVE DEFENSE
### (Prosecution History Estoppel)

30.      Prosecution history and/or estoppel bars Vertical from asserting

infringement of claims of the Asserted Patents under the Doctrine of Equivalents because of

statements and amendments made during prosecution of the Asserted Patents.

APP. 195

## SIXTH AFFIRMATIVE DEFENSE
### (Governmental Uses)

31.     Vertical's claims for relief and prayer for damages are limited by 28 U.S.C. § 1498(a).

## SEVENTH AFFIRMATIVE DEFENSE
### (Lack of Standing)

32.     On information and belief, Vertical lacks standing to bring this action.

## EIGHTH AFFIRMATIVE DEFENSE
### (Laches, Waiver, Acquiescence, Estoppel)

33.     Upon information and belief, laches, waiver, acquiescence, and/or estoppel bar Vertical's remedies under the Asserted Patents.

## NINTH AFFIRMATIVE DEFENSE
### (Notice)

34.     Upon information and belief, Vertical's claims for relief and alleged damages and limited by 35 U.S.C. § 287.

## TENTH AFFIRMATIVE DEFENSE
### (Inequitable Conduct)

35.     The Asserted Patents are unenforceable due to inequitable conduct as set forth in Paragraphs 51-109 below, which are incorporated by reference as though fully set forth herein.

## SAMSUNG'S COUNTERCLAIMS

36.     Defendant/Counterclaim-Plaintiff Samsung brings the following counterclaims against Plaintiff/Counterclaim-Defendant Vertical.

APP. 196

## PARTIES

37.     Samsung Electronics Co., Ltd. is a corporation organized under the laws of the Republic of Korea and has its principal place of business at 1320-10, Seocho 2-dong, Seocho-gu, Seoul 137-857, Republic of Korea.

38.     Samsung Electronics America, Inc. is a New York corporation and has its principal place of business at 85 Challenger Road, Ridgefield Park, NJ 07660.

39.     Upon information and belief, Vertical is a Delaware corporation with a principal place of business in Richardson, Texas.

## JURISDICTION AND VENUE

40.     This Court has subject-matter jurisdiction over Samsung's patent counterclaims, which arise under the patent laws of the United States pursuant to 28 U.S.C. §§ 1331, 1338, 2201, and 2202.

41.     This Court has personal jurisdiction over Vertical, at least because Vertical purportedly has its primary place of business in this district, and filed its claims for patent infringement in this Court, in response to which these counterclaims are filed.

42.     Venue lies in this judicial district pursuant to 28 U.S.C. §§ 1391 and 1400. Venue also lies in this district because Vertical has consented to the propriety of venue in this district by filing its claims for patent infringement in this district, in response to which these counterclaims are filed.

## COUNT I (DECLARATORY JUDGMENT OF NON-INFRINGEMENT)

43.     Samsung realleges and incorporates by reference Paragraphs 36-42 above as though fully set forth herein.

APP. 197

44.     An actual and justiciable controversy exists between Samsung and Vertical with respect to the Asserted Patents because Vertical has brought this action against Samsung alleging that Samsung infringes the Asserted Patents, which Samsung denies.   Absent a declaration of non-infringement, Vertical will continue to wrongfully assert the Asserted Patents against Samsung, and thereby cause Samsung irreparable injury and damage.

45.     Samsung has not infringed, and does not infringe, the Asserted Patents, either directly or indirectly, literally or under the doctrine of equivalents, willfully, or otherwise, and Samsung is entitled to a declaration to that effect.

## COUNT II (DECLARATORY JUDGMENT OF INVALIDITY)

46.     Samsung realleges and incorporates by reference Paragraphs 36-45 above as though fully set forth herein.

47.     An actual and justiciable controversy exists between Samsung and Vertical with respect to the Asserted Patents because Vertical has brought this action against Samsung alleging that the Asserted Patents are valid, which Samsung denies.   Absent a declaration of invalidity, Vertical will continue to wrongfully assert the Asserted Patents against Samsung, and thereby cause Samsung irreparable injury and damage.

48.     The Asserted Patents are invalid for failure to comply with the requirements of 35 U.S.C. § 100 et seq., including but not limited to, §§ 102, 103, and 112, and Samsung is entitled to a declaration to that effect.

## COUNT III (DECLARATORY JUDGMENT OF UNENFORCEABILITY)

49.     Samsung realleges and incorporates by reference Paragraphs 36-48 above as though fully set forth herein.

APP. 198

50.     An actual and justiciable controversy exists between Samsung and Vertical with respect to the enforceability of the Asserted Patents because Vertical has brought this action against Samsung alleging that the Asserted Patents are enforceable, which allegation Samsung denies.   Absent a declaration of unenforceability, Vertical will continue to wrongfully assert the Asserted Patents against Samsung, and thereby cause Samsung irreparable injury and damage.

### The '744 Patent

51.     The claims of the '744 patent are unenforceable as a result of inequitable conduct before the United States Patent and Trademark Office ("PTO").   One or more of the people substantively involved in the prosecution of the application leading to the '744 patent, including inventor Aubrey McAuley, were aware of information material to the patentability of the '744 patent, but withheld that information from the PTO with the intent to deceive, and made false and misleading statements to the PTO during the prosecution of the '744 patent, as set forth herein.

52.     Aubrey McAuley, the named inventor of the '744 patent, was a founder and president of Adhesive Media, Inc. ("Adhesive").

53.     On information and belief, Adhesive offered for sale and sold software products and/or services based on its "WebOS" technology more than one year before October 1, 1999, the filing date of the application leading to the '744 patent.   Those software products and/or services included Adhesive's "NewsFlash" product, as well as a number of websites that Adhesive designed for particular customers, purportedly using Adhesive's WebOS technology.

54.     On information and belief, Adhesive also published information relating to its software products and/or services based on its WebOS technology more than one year before

October 1, 1999.   For example, more than one year before October 1, 1999, Adhesive posted on

the Internet a diagram of the Web Object Management Facility of its WebOS technology, which

is attached hereto as Exhibit A.

55.     Exhibit A is nearly identical to Figure 5 of the '744 patent.

56.     The specification of the '744 patent describes Figure 5 as an alleged

embodiment of "the present invention."   *See* '744 patent at 5:3-17.

57.     Therefore, Adhesive's commercial offer for sale and sale of products and

services based on its WebOS technology, and Adhesive's publication of information relating to

its WebOS technology, all of which occurred more than one year before October 1, 1999,

constitute material prior art.

58.     Upon information and belief, prior to issuance of the '744 patent, Mr.

McAuley had knowledge of Adhesive's offer for sale and sale of its WebOS technology and

Adhesive's publication of information relating to its WebOS technology.

59.     None of the persons involved in the prosecution of the '744 patent,

including but not limited to Mr. McAuley, disclosed to the PTO Adhesive's offer for sale or sale

of its WebOS technology or the publication of information relating to its WebOS technology.

60.     Information regarding Adhesive's offer for sale and sale of WebOS

technology, and publications relating thereto, was withheld from the PTO with intent to deceive.

61.     This withholding of information material to patentability with intent to

deceive the PTO constitutes inequitable conduct, which renders the '744 patent unenforceable.

**The '629 Patent**

62.     The claims of the '629 patent are unenforceable as a result of inequitable

conduct before the PTO.   On information and belief, one or more of the people substantively

APP. 200

involved in the prosecution of the application leading to the '629 patent, including inventor
Aubrey McAuley and patent agent Jack D. Stone Jr., were aware of information material to the
patentability of the '629 patent, but withheld that information from the PTO with the intent to
deceive, and made false and misleading statements to the PTO during the prosecution of the '629
patent, as set forth herein.

63.     During the prosecution of the '629 patent, Vertical initiated a patent
infringement suit against Microsoft Corporation in the Eastern District of Texas, Civil Action
No. 2:07-CV-144 ("the Microsoft litigation"), alleging infringement of the '744 patent.

64.     During the course of the Microsoft litigation, material information
regarding the patentability of the '744 patent was disclosed by Microsoft to Vertical and
Vertical's attorneys.   For example, Microsoft raised inequitable conduct allegations regarding
the '744 patent in its Answer to Vertical's complaint, Microsoft served invalidity contentions
explaining how numerous prior art references anticipated and/or rendered obvious the claims of
the '744 patent, Microsoft produced copies of the underlying prior art references, and Microsoft
filed a claim construction brief arguing that numerous claims of the '744 patent were invalid
under 35 U.S.C. § 112.   However, this material information was not properly disclosed to the
PTO during the prosecution of the '629 patent.

65.     Because the application leading to the '629 patent is a continuation of the
'744 patent, and because the claims and specifications of the '629 and '744 patents are
substantially similar, Microsoft's inequitable conduct allegations, invalidity contentions and
arguments, and the invalidating prior art references it produced in the Microsoft litigation are
also material to the patentability of the '629 patent.

### Microsoft's Inequitable Conduct Allegations

66.     On July 13, 2007, Microsoft filed its Answer, Affirmative Defenses, and Counterclaims ("Microsoft's Answer") in the Microsoft litigation. Microsoft alleged that the '744 patent was unenforceable due to the inequitable conduct of Mr. McAuley in failing to disclose material information to the PTO.   In particular, Microsoft alleged that Mr. McAuley, with intent to deceive, failed to disclose Adhesive's offer for sale and sale of products and services based on Adhesive's WebOS technology, and publications relating thereto, more than one year prior to October 1, 1999.

67.     Microsoft's inequitable conduct allegations disclose critical information expressly challenging the validity and enforceability of the related '744 patent.

68.     None of the persons involved in the prosecution of the '629 patent, including Mr. McAuley and Mr. Stone, disclosed to the PTO either Microsoft's Answer or the existence or substance of Microsoft's inequitable conduct allegations.

69.     Further, during prosecution of the '629 patent, the applicants disclosed certain prior art documents relating to Adhesive's prior art WebOS technology relied on by Microsoft during the Microsoft litigation, but failed to disclose the critical facts that Mr. McAuley was the founder and president of Adhesive and other information indicating that the WebOS technology qualified as prior art under 35 U.S.C. § 102(b).

70.     The knowledge that Mr. McAuley is both a named inventor of the '629 patent and the founder and president of Adhesive, as well as the date of the WebOS materials, is essential for the PTO to fully understand the relevance and applicability of Adhesive's prior art WebOS technology.

71.     During prosecution of the '629 patent, the applicants selectively disclosed to the PTO only certain information and prior art materials from the Microsoft litigation.

APP. 202

72.     The selective disclosure to the PTO of information arising out of the Microsoft litigation demonstrates that Mr. McAuley and Mr. Stone were aware of the Microsoft litigation and the existence of material regarding the patentability of the '629 patent information arising out of that litigation.

73.     This selective disclosure to the PTO also demonstrates that Mr. McAuley and Mr. Stone made a deliberate decision to withhold material information from the PTO, and thus demonstrates an intent to deceive.

74.     The withholding of information material to patentability with intent to deceive constitutes inequitable conduct, which renders the '629 patent unenforceable.

**Microsoft's Invalidity Contentions and Claim Construction Brief**

75.     On January 18, 2008, Microsoft served its Invalidity Contentions in the Microsoft litigation.

76.     Microsoft's Invalidity Contentions identified 58 prior art references that anticipated and/or rendered obvious claims 1-5, 9, 11, 17-19, 21, 23, 25-29, 33, 39-41, 43, 45, and 47-48 of the '744 patent and provided over 50 pages of narrative analysis of how the identified prior art anticipated and/or rendered obvious the asserted claims.   The Invalidity Contentions also included over 250 pages of claim charts mapping the prior art references to each limitation of the asserted claims.   Further, the Invalidity Contentions include an analysis of the '744 patent's invalidity based on lack of enablement, lack of written description, and indefiniteness.

77.     On July 18, 2008, Microsoft served its First Amended Invalidity Contentions in the Microsoft litigation.

14

78.    Microsoft's First Amended Invalidity Contentions added three prior art references to Microsoft's prior Invalidity Contentions, identifying a total of 61 prior art references that anticipated and/or rendered obvious claims 1-5, 9, 11, 17-19, 21, 23, 25-29, 33, 39-41, 43, 45, 47-48, and 53 of the '744 patent.   As with the initial Invalidity Contentions, Microsoft First Amended Invalidity Contentions provided over 50 pages of narrative analysis of how the identified prior art anticipated and/or rendered obvious the asserted claims and included over 250 pages of claim charts mapping the prior art references to each limitations of the asserted claims.   Further, the First Amended Invalidity Contentions include an analysis of the '744 patent's invalidity based on lack of enablement, lack of written description, and indefiniteness.

79.    On June 6, 2008, Microsoft filed its Claim Construction Brief in the Microsoft litigation.

80.    Microsoft argued in its Claim Construction Brief that the term "arbitrary object framework" is fatally indefinite.

81.    The term "arbitrary object framework" is found in all independent claims of both the '744 and '629 patents, making Microsoft's indefiniteness argument material to the patentability of the '629 patent.

82.    Microsoft's Invalidity Contentions, First Amended Invalidity Contentions, and Claim Construction Brief disclose critical information expressly challenging the validity of the related '744 patent, and thus constitute material prior art.

83.    None of the persons involved in the prosecution of the '629 patent, including Mr. McAuley and Mr. Stone, disclosed to the PTO Microsoft's Invalidity Contentions, First Amended Invalidity Contentions, or Claim Construction Brief.   Further, none of the persons involved in the prosecution of the '629 patent, including Mr. McAuley and Mr. Stone,

15

disclosed to the PTO the existence of Microsoft's Invalidity Contentions, First Amended

Invalidity Contentions, or Claim Construction Brief or the substance of the invalidity arguments

set forth therein.

84.     Only some prior art references relied on during the Microsoft litigation

were selectively disclosed to the PTO during prosecution of the '629 patent.

85.     The selective disclosure to the PTO of information arising out of the

Microsoft litigation demonstrates that Mr. McAuley and Mr. Stone were aware of the Microsoft

litigation and the existence of material information regarding the patentability of the '629 patent

arising out of that litigation.

86.     This selective disclosure to the PTO also demonstrates that Mr. McAuley

and Mr. Stone made a deliberate decision to withhold material information from the PTO, and

thus demonstrates an intent to deceive.

87.     The withholding of information material to patentability with intent to

deceive constitutes inequitable conduct, which renders the '629 patent unenforceable.

### Prior Art References Produced by Microsoft

88.     In an Information Disclosure Statement, the '629 patent applicants

disclosed to the PTO 24 of the 61 prior art references (or excerpts thereof) that were identified by

Microsoft in its Invalidity Contentions and First Amended Invalidity Contentions as anticipating

and/or rendering obvious certain claims of the '744 patent.

89.     On information and belief, none of the persons involved in the prosecution

of the '629 patent, including Mr. McAuley and Mr. Stone, disclosed to the PTO any references

identified in Microsoft's Invalidity Contentions or First Amended Invalidity Contentions that

pertain to the prior art Borland Delphi technology.   Specifically, none of the persons involved in

the prosecution of the '629 patent disclosed to the PTO: (i) *Borland Delphi 3 for Windows 95 & Windows NT, User's Guide*, Borland International, Inc. (1997); (ii) *Borland's Official No-Nonsense Guide to Delphi 2*, Sams Publishing (1996); (iii) Osier et al., *Teach Yourself Delphi 3 in 14 Days*, Sams Publishing (1997); (iv) Reisdorph, *Sams Teach Yourself Borland Delphi 4 in 21 Days*, Sams Publishing (1998); (v) Swan, *Delphi 4 Bible*, IDG Books Worldwide, Inc., Tom Swan (1998); (vi) Teixeira et al., *Borland Delphi 4 Developer's Guide*, Sams Publishing (1998).

90.     On information and belief, none of the persons involved in the prosecution of the '629 patent, including Mr. McAuley and Mr. Stone, disclosed to the PTO any references identified in Microsoft's Invalidity Contentions or First Amended Invalidity Contentions that pertain to the prior art Microsoft Visual J++ technology.    Specifically, none of the persons involved in the prosecution of the '629 patent disclosed to the PTO: (i) Doss, *DCOM Networking with Visual J++ 6.0*, Wordware Publishing, Inc. (1999); (ii) Morgan et. al, *Visual J++ Unleashed*, Sams.net Publishing (1997); (iii) Mulloy, *Using Visual J++ 6*, Que Corporation (1998); (iv) Wood, *Visual J++ 6 Secrets*, IDG Books Worldwide, Inc. (1998).

91.     On information and belief, none of the persons involved in the prosecution of the '629 patent, including Mr. McAuley and Mr. Stone, disclosed to the PTO any references identified in Microsoft's Invalidity Contentions or First Amended Invalidity Contentions that pertain to the prior art ASP technology. Specifically, none of the persons involved in the prosecution of the '629 patent disclosed to the PTO: (i) Fedorchek et. al, *ASP: Active Server Pages*, IDG Books Worldwide, Inc. (1997); (ii) Fedorov et. al, *ASP 2.0 Programmer's Reference*, Wrox Press (1998).

92.     On information and belief, none of the persons involved in the prosecution of the '629 patent, including Mr. McAuley and Mr. Stone, disclosed to the PTO any references

identified in Microsoft's Invalidity Contentions or First Amended Invalidity Contentions that pertain to the prior art Lotus Notes and Domino 4.5 technology.   Specifically, none of the persons involved in the prosecution of the '629 patent disclosed to the PTO: (i) Forlini et. al, *Lotus Notes and Domino 4.5 Professional Reference*, New Riders Publishing (1997); (ii) Krantz, *Building Intranets with Lotus Notes & Domino*, Maximum Press (1997).

93.     On information and belief, none of the persons involved in the prosecution of the '629 patent, including Mr. McAuley and Mr. Stone, disclosed to the PTO any references identified in Microsoft's Invalidity Contentions or First Amended Invalidity Contentions that pertain to the prior art Paradox 7 technology.   Specifically, none of the persons involved in the prosecution of the '629 patent disclosed to the PTO: (i) Karim et. al, *Paradox 7 Projects for Windows 95*, The Benjamin/Cummings Publishing Company, Inc. (1997); (ii) Weingarten et. al, *Paradox 7 for Windows 95 Illustrated Brief Edition*, CTI (1997).

94.     Just as was the case with the 24 prior art references from the Microsoft litigation that the applicants did disclose to the PTO, the narrative and claim charts submitted with Microsoft's Invalidity Contentions and First Amended Invalidity contentions demonstrate how the undisclosed Borland Delphi, Microsoft Visual J++, ASP, Lotus Notes and Domino 4.5, and Paradox 7 prior art references listed in Paragraphs 89-93 above anticipate and/or render obvious the asserted claims in the Microsoft litigation. Therefore, the undisclosed Borland Delphi, Microsoft Visual J++, ASP, Lotus Notes and Domino 4.5, and Paradox 7 prior art references listed in Paragraphs 89-93 above constitute material prior art.

95.     The selective disclosure to the PTO of prior art references identified by Microsoft during the Microsoft litigation demonstrates that Mr. McAuley and Mr. Stone were

aware of the Microsoft litigation and the existence of material information regarding the

patentability of the '629 patent arising out of that litigation.

96.     This selective disclosure to the PTO also demonstrates that Mr. McAuley

and Mr. Stone made a deliberate decision to withhold material information from the PTO, and

thus demonstrates an intent to deceive.

97.     The withholding of information material to patentability with intent to

deceive constitutes inequitable conduct, which renders the '629 patent unenforceable.

### Prior Art References Disclosed by Interwoven

98.     On or about January 12, 2009, Vertical contacted Interwoven, taking the

position that the '744 patent contains claims that it believes cover Interwoven's TeamSite Team

XM2, TeamSite Server and TeamSite Live Lite Content Publishing Server products (hereinafter

"TeamSite prior art").

99.     On or about March 5, 2009, Vertical's agent and attorney, Vasilios Dossas

and its Chief Technology Officer, Luiz Claudio Valdetaro met with representatives from

Interwoven at Interwoven's headquarters in San Jose, California.

100.     During this meeting Interwoven presented Mr. Dossas and Mr. Valdetaro

with information including claim charts, clearly indicating that the alleged infringing TeamSite

prior art has been in use and was on sale prior to October 1, 1998.   As such, TeamSite

constitutes material prior art under at least 35 U.S.C. § 102(b).

101.     On information and belief, Vertical is a company that had approximately

29 employees at the time of its meeting with Interwoven, and Mr. Valdetaro is the highest

ranking management-level employee at Vertical primarily responsible for technology, including

APP. 208

the development and monetization of Vertical's intellectual property and represented Vertical in this capacity at the meeting with Interwoven.

102.    On information and belief, persons involved in the prosecution of the '629 patent, including Mr. Valdetaro, Mr. McAuley and Mr. Stone, were aware of the existence of material information regarding the patentability of the '629 patent arising out of its discussions with Interwoven, including at least the prior art disclosed by Interwoven at the March 5, 2009 meeting at Interwoven's headquarters.

103.    On information and belief, in his position as Chief Technology Officer, Mr. Valdetaro would have known, or should have known, about pending patent applications, especially the '629 application which was a continuation of the '744 patent that he and Mr. Dossas were attempting to license to Interwoven during the March 5, 2009 meeting.

104.    On information and belief, by virtue of his position as Vertical's Chief Technology Officer and knowledge of the Interwoven TeamSite prior art, Mr. Valdetaro had a duty to disclose this material prior art to the PTO during the prosecution of the '629 patent.

105.    On information and belief, by virtue of his position as Vertical's Chief Technology Officer, if he himself was not the person who should have disclosed the Interwoven TeamSite prior art to the PTO, Mr. Valdetaro would have known the appropriate person at Vertical to whom this information should be disclosed, and had a duty to disclose this relevant information to that person.

106.    On information and belief, none of the persons involved in the prosecution of the '629 patent, including Mr. Valdetaro, Mr. McAuley and Mr. Stone, disclosed to the PTO any references identified by Interwoven related to its TeamSite prior art.

APP. 209

107.     The TeamSite prior art is material and would have been relevant to the patentability of at least the '629 patent.

108.     On information and belief, the TeamSite prior art was withheld from the PTO with the intent to deceive.

109.     The withholding of information material to patentability with intent to deceive constitutes inequitable conduct, which renders the '629 patent unenforceable.

## PRAYER FOR RELIEF

WHEREFORE, Samsung prays for the following relief:

A.     that the Court dismiss Vertical's Complaint with prejudice;

B.     that the Court adjudicate that Samsung is not infringing, contributing to, or inducing infringement of, and have not infringed, contributed to, or induced infringement of any of the claims of the Asserted Patents, willingly or otherwise;

C.     that the Court adjudicate that the claims of the Asserted Patents are invalid and unenforceable;

D.     that the Court deny Vertical any and all relief it has requested in its Complaint;

E.     that the Court deny any preliminary or permanent injunctive relief in favor of Vertical and against Samsung;

F.     that Vertical shall take nothing by way of its Complaint;

G.     that the Court find that this case is an exceptional case under 35 U.S.C. § 285, and require Vertical to pay costs of suit that Samsung has incurred, including attorneys' fees and costs, pursuant to 35 U.S.C. § 285 and all other applicable statutes, rules, and common law; and

APP. 210

H.      that the Court grant Samsung costs and such other and further relief to

which Samsung is entitled and which the Court deems just and reasonable.

Dated:   May 27, 2011                    Respectfully submitted,


                                         By: */s/ Eric H. Findlay*
                                         Eric H. Findlay
                                             State Bar No. 00789886
                                             efindlay@findlaycraft.com
                                         Brian Craft
                                             State Bar No. 049702020
                                             bcraft@findlaycraft.com
                                         FINDLAY CRAFT LLP
                                         6760 Old Jacksonville Hwy Suite 101
                                         Tyler, TX 75703
                                         Telephone: 903-534-1100
                                         Fax: 903-534-1137

                                         Matthew D. Powers
                                             matthew.powers@weil.com
                                         Steven Cherensky
                                             steven.cherensky@weil.com
                                         WEIL, GOTSHAL & MANGES LLP
                                         201 Redwood Shores Parkway
                                         Redwood Shores, CA 94065
                                         Telephone: 650-802-3000
                                         Fax: 650-802-3100

                                         Timothy DeMasi
                                             tim.demasi@weil.com
                                         Julian Moore
                                             julian.moore@weil.com
                                         WEIL, GOTSHAL & MANGES LLP
                                         767 5th Avenue
                                         New York, NY 10153
                                         Telephone: 212-310-8000
                                         Fax: 212-310-8007

                                         ATTORNEYS FOR DEFENDANTS
                                         SAMSUNG ELECTRONICS CO., LTD.
                                         SAMSUNG ELECTRONICS AMERICA, INC.

### CERTIFICATE OF SERVICE

I hereby certify that all counsel of record, who are deemed to have consented to electronic service are being served this 27th day of May 2011, with a copy of this document via the Court's CM/ECF system per Local Rule CV-5(a)(3).

_____/s/ *Eric H. Findlay*_____
Eric H. Findlay

APP. 212

EXHIBIT M

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

| | | |
|---|---|---|
| **VERTICAL COMPUTER SYSTEMS, INC.,** | § | |
| | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. 2:10-CV-490** |
| | § | |
| **INTERWOVEN, INC.,** | § | |
| **LG ELECTRONICS MOBILECOMM** | § | |
| **U.S.A., INC., LG ELECTRONICS INC.,** | § | |
| **SAMSUNG ELECTRONICS CO., LTD.,** | § | |
| **SAMSUNG ELECTRONICS AMERICA,** | § | |
| **INC.,** | § | |
| | § | |
| **Defendants.** | § | |

## NOTICE OF APPEARANCE OF COUNSEL

Defendants, Samsung Electronics Co., Ltd. ("SEC") and Samsung Electronics America, Inc. ("SEA"), file this Notice of Appearance, and hereby notify the Court that Steven S. Cherensky, of the law firm Weil Gotshal & Manges LLP, 201 Redwood Shores Parkway, Redwood Shores, CA 94065, Telephone (650) 802-3000, Fax (650) 802-3100, E-mail: steven.cherensky@weil.com has entered this action as counsel for SEC and SEA. In connection with this notice, Mr. Cherensky requests that all future pleadings and other papers filed under Fed. R. Civ. P. 5 be served on him at the above address and contact information.

Dated: December 20, 2010                    Respectfully Submitted:

/s/ Steven S. Cherensky
Steven S. Cherensky, Lead Attorney
California Bar No. 168275
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway

US_ACTIVE:\43587691\01\71868.0049

Redwood Shores, CA 94065
650-802-3000 (Telephone)
650-802-3100 (Facsimile)
steven.cherensky@weil.com


## CERTIFICATE OF SERVICE

I hereby certify that on December 20, 2010, I electronically filed the foregoing **NOTICE**

**OF APPEARANCE OF COUNSEL** with the Clerk of the Court using the CM/ECF system

which will send notification of such filing via electronic mail to all counsel of record.


/s/ Steven S. Cherensky
Steven S. Cherensky

US_ACTIVE:\43587691\01\71868.0049

APP. 215

EXHIBIT N

APP. 216

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | |
|---|---|
| VERTICAL COMPUTER SYSTEMS, INC. ) | |
| ) | |
| Plaintiff, ) | |
| ) | Civil Action No. 2:10-CV-490 |
| vs. ) | |
| ) | |
| INTERWOVEN, INC., LG ELECTRONICS) | |
| MOBILECOMM U.S.A., INC., LG ) | |
| ELECTRONICS INC., SAMSUNG ) | |
| ELECTRONICS CO., LTD. SAMSUNG ) | |
| ELECTRONICS AMERICA, INC., ) | |
| ) | |
| Defendants. ) | |

**MOTION TO WITHDRAW AS ATTORNEY**

TO THE HONORABLE JUDGE OF SAID COURT:

Steven S. Cherensky files this motion to withdraw as counsel for Samsung.

Samsung is currently represented by Eric H. Findlay of the law firm Findlay Craft, LLP

and by Jared Bobrow, Timothy E. DeMasi, and Julian Moore of the law firm Weil

Gotshal & Manges and will not be prejudiced by this withdrawal.


Dated:  October 12, 2011             Respectfully submitted,

                                    TENSEGRITY LAW GROUP, LLP


                                    By:____/s/ Steven S .Cherensky_____
                                         Steven S. Cherensky
                                    CA State Bar No. 168275
                                    201 Redwood Shores Parkway
                                    Suite 401
                                    Redwood Shores, CA 94065
                                    Telephone:  650-802-6000
                                    Fax:  650-802-6001
                                    Steven.cherensky@tensegritylawgroup.com

CERTIFICATE OF SERVICE

This is to certify that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system per Local Rule CV-5(a) on this 12th day of October 2011.

_____*/s/ Steven S. Cherensky*_____
Steven S. Cherensky

CERTIFICATE OF CONFERENCE

I hereby certify that on October 10, 2011 attorneys for all parties were advised by email that the undersigned would be moving to withdraw as counsel for Samsung in this matter.  No opposition was received from any party.

_____*/s/ Steven S. Cherensky*_____
Steven S. Cherensky

APP. 218

EXHIBIT O

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | |
|---|---|
| VERTICAL COMPUTER SYSTEMS, INC., <br><br> Plaintiff, <br><br> v. <br><br> LG ELECTRONICS MOBILECOMM U.S.A., INC., LG ELECTRONICS INC., SAMSUNG ELECTRONICS CO., LTD., SAMSUNG ELECTRONICS AMERICA, INC., <br><br> Defendants. | Civil Action No.  2:10-cv-490 <br><br> **JURY TRIAL DEMANDED** |

## <u>FIRST AMENDED COMPLAINT</u>

Plaintiff, Vertical Computer Systems, Inc. ("Vertical") brings this action against Defendants LG Electronics MobileComm U.S.A., Inc., LG Electronics Inc., Samsung Electronics Co., Ltd. and Samsung Electronics America, Inc. (collectively, "defendants"), alleging as follows:

**I.      PARTIES**

1.      Plaintiff Vertical is a Delaware corporation with a principal place of business in Richardson, Texas.

2.      Defendant LG Electronics MobileComm U.S.A., Inc. is a California corporation and has its principal place of business at 1000 Sylvan Avenue, Englewood Cliffs, NJ 07632.  LG Electronics MobileComm U.S.A., Inc. is doing business in this judicial district and may be served with process through its Registered Agent, Alan K. Tse, 10101 Old Grove Road, San Diego, CA  92131.

3.      LG Electronics Inc. is a corporation organized under the laws of the Republic of Korea and has its principal place of business at LG Twin Towers 20, Yeouido dong, Yeongdeungpo-gu, Seoul, Republic of Korea 150-721.

4.      Samsung Electronics America, Inc. is a New York corporation and has its principal place of business at 85 Challenger Road, Ridgefield Park, NJ  07660.  Samsung is doing business in this judicial district and may be served with process through its Registered Agent, CT Corporation System, 111 Eighth Avenue, New York, NY  10011.

5.      Samsung Electronics Co., Ltd. is a corporation organized under the laws of the Republic of Korea and has its principal place of business at 1320-10, Seocho 2-dong, Seocho-gu, Seoul 137-857, Republic of Korea.

## II.      JURSIDICTION AND VENUE

6.      Vertical's patent infringement action arises under the patent laws of the United States, including 35 U.S.C. §§ 271 and 281.  This Court has exclusive subject matter jurisdiction over this civil action under 28 U.S.C. § 1338(a).

7.      LG Electronics MobileComm U.S.A., Inc. and LG Electronics Inc. (collectively, "LG") have minimum contacts with the Marshall Division of the Eastern District of Texas such that this venue is a fair and reasonable one.  LG has committed such purposeful acts and/or transactions in Texas that it reasonably knew and expected would result in it being brought into a Texas court as a consequence of its business activities.  For these reasons, venue is proper in this Court under 28 U.S.C. §§ 1391(b) and (c) and 28 U.S.C. § 1400(b).

8.      Samsung Electronics Co., Ltd. and Samsung Electronics America, Inc. (collectively, "Samsung") have minimum contacts with the Marshall Division of the Eastern District of Texas such that this venue is a fair and reasonable one.  Samsung has committed such purposeful acts and/or transactions in Texas that it reasonably knew and expected would result in it being brought into a Texas court as a consequence of its business activities.  For these reasons, venue is proper in this Court under 28 U.S.C. §§ 1391(b) and (c) and 28 U.S.C. § 1400(b).

APP. 221

## III.     PATENT INFRINGEMENT

9.      On November 30, 2004, United States Patent No. 6,826,744 (the "'744 patent") was duly and legally issued for a "System and Method for Generating Web Sites in an Arbitrary Object Framework."

10.     On May 11, 2010, United States Patent No. 7,716,629 (the "'629 patent") was duly and legally issued for a "System and Method for Generating Web Sites in an Arbitrary Object Framework."

11.     Vertical is the owner of the '744 and '629 patents and has standing to sue for infringement.

12.     Defendants LG and Samsung manufacture, have made, use, import, sell and/or offer for sale cellular telephones covered by at least one claim of each of the '744 and '629 patents.  Defendants LG and Samsung have also infringed and continue to infringe the '744 and '629 patents by actively inducing others to infringe with specific intent and by contributing to the infringement by others by the use, sale and/or offer for sale of the infringing cellular telephones. The infringement that has occurred is at least one of the following claims through commercialization of at least the following model phones:

|  | Claims of '744 Patent | Claims of '629 Patent | Model Nos. |
|---|---|---|---|
| LG | 3, 4, 17, 25, 56 | 1, 21, 24, 28, 32 | Ally™ VS740<br>LG Ally/Apex/Axis<br>LG DoublePlay<br>LG Enlighten/Optimus Slider<br>LG Esteem<br>LG G2x/Optimus 2x<br>LG Genesis<br>LG Marquee<br>LG my Touch Q<br>LG my Touch<br>LG Optimus M/Optimus C<br>LG Optimus S/Optimus U/<br>Optimus V<br>LG Optimus T |

3

| | Claims of '744 Patent | Claims of '629 Patent | Model Nos. |
|---|---|---|---|
| | | | LG Revolution<br>LG Thrill 4 G/Optimus 3D<br>LG Thrive Phoenix<br>LG Vortex |
| Samsung | 3, 4, 17, 25, 56 | 1, 21, 24, 28, 32 | Acclaim SCH-R880<br>Admire Vitality<br>Behold II<br>Captivate (Galaxy S)<br>Conquer 4G<br>Continuum (Galaxy S)<br>Dart<br>Droid Charge<br>Epic 4G (Galaxy S)<br>Epic 4G Touch (Galaxy S II)<br>Exhibit 4G (Galaxy S)<br>Exhibit II 4G<br>Fascinate/Mesmerize<br>(Galaxy S)<br>Galaxy Indulge R910/<br>Indulge R915<br>Galaxy Prevail<br>Galaxy S 4G<br>Galaxy S II/SGH i777<br>Galaxy S II/SGH-T989<br>Galaxy S II Skyrocket<br>Gem<br>Gravity Smart<br>Infuse 4G<br>Intercept<br>Moment<br>Replenish<br>Sidekick 4G<br>Stratosphere<br>Transfix<br>Transform Ultra<br>Transform<br>Vibrant (Galaxy S)<br><br>Samsung Galaxy Tab10.1 with<br>    Verizon 4G LTE<br>Samsung Galaxy Tab 10.1<br>Samsung Galaxy Tab 7.0<br>Samsung Galaxy Tab 8.9Galaxy Tab™<br>    Tablet Computer<br>Galaxy Captivate™ Android Phone |

4

| | Claims of '744 Patent | Claims of '629 Patent | Model Nos. |
|---|---|---|---|
| | | | Galaxy Fascinate™ Android Phone<br>Galaxy Epic™ Android Phone<br>Samsung Galaxy Mesmerize™<br>i500 Touch Screen Cell Phone |

## IV.   STATUTORY NOTICE

13.   Vertical has placed the required statutory notice on all software products sold by it under the '744 and '629 patents.

## V.   RELIEF

14.   Vertical has been damaged as a result of LG's and Samsung's infringing conduct and LG, Samsung and Interwoven are, thus, liable to Vertical in an amount that adequately compensates Vertical for LG's and Samsung's infringement, which, by law, cannot be less than a reasonable royalty for each of these two defendants.

15.   LG and Samsung will continue their infringement of the '744 and '629 patents unless enjoined by the Court.  LG's and Samsung's infringing conduct causes Vertical irreparable harm and will continue to cause such harm without the issuance of an injunction.

## VI.   JURY DEMAND

16.   Vertical hereby requests a trial by jury pursuant to Rule 38 of the Federal Rules of Civil Procedure.

## VII.   PRAYER FOR RELIEF

Vertical respectfully requests that the Court find in its favor and against LG and Samsung and that the Court grant Vertical the following relief:

a.   Judgment that one or more claims of United States Patent No. 6,826,744 and United States Patent No. 7,716,629 have been infringed, either literally and/or under the doctrine

APP. 224

of equivalents, by LG and Samsung and/or by others to whose infringement LG and Samsung have contributed and/or by others whose infringement has been induced by LG and Samsung;

b.      Judgment that LG and Samsung account for and pay to Vertical all damages to and costs incurred by Vertical because of LG and Samsung's infringing activities and other conduct complained of herein;

c.      That Vertical be granted pre-judgment and post-judgment interest on the damages caused to it by reason of LG's and Samsung's infringing activities and other conduct complained of herein;

d.      That this Court declare this an exceptional case and award Vertical its reasonable attorneys' fees and costs in accordance with 28 U.S.C. § 285;

e.      That LG and Samsung be permanently enjoined from any further activity or conduct that infringes any claims of United States Patent No. 6,824,744 and United States Patent No. 7,716,629; and

f.      That Vertical be granted such other and further relief as the Court or jury may deem just and proper under the circumstances.

Dated:  February 1, 2013                      Respectfully submitted,

                                              By:  /s/ William E. Davis, III
                                              William E. Davis, III
                                              Texas State Bar No. 24047416
                                              **The Davis Firm, PC**
                                              111 West Tyler Street
                                              Longview, Texas  75601
                                              Telephone:  (903) 230-9090
                                              Facsimile: (903) 230-9661
                                              Email: bdavis@bdavisfirm.com

                                              Vasilios D. Dossas
                                              Illinois State Bar No. 6182616
                                              **Niro, Haller & Niro**
                                              181 West Madison Street, Suite 4600
                                              Chicago, Illinois 60602
                                              Telephone: (312) 236-0733

APP. 225

Facsimile: (312) 236-3137
Email: dossas@nshn.com

**Attorneys for Plaintiff**
**Vertical Computer Systems, Inc.**

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned certifies that the foregoing document was filed electronically in compliance with Local Rule CV-5(a). As such, this document was served on all counsel who are deemed to have consented to electronic service. Local Rule CV-5(a)(3)(A). Pursuant to Fed. R. Civ. P. 5(d) and Local Rule CV-5(d) and (e), all other counsel of record not deemed to have consented to electronic service were served with a true and correct copy of the foregoing by email, on this the 1st day of February, 2013.

<u>/s/ William E. Davis, III</u>
William E.  Davis, III

7

APP. 226

EXHIBIT P



US006826744B1

(12) **United States Patent**     (10) **Patent No.:**    **US 6,826,744 B1**

McAuley            (45) **Date of Patent:**      **Nov. 30, 2004**

(54) **SYSTEM AND METHOD FOR GENERATING WEB SITES IN AN ARBITRARY OBJECT FRAMEWORK**

(75) Inventor: **Aubrey McAuley**, Austin, TX (US)

(73) Assignee: **Vertical Computer Systems, Inc.,** Austin, TX (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/410,334**

(22) Filed: **Oct. 1, 1999**

(51) **Int. Cl.**$^7$ ................................................. **G06F 9/45**
(52) **U.S. Cl.** .................................................... **717/108**
(58) **Field of Search** ..................... 717/108; 707/103 R; 715/522

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 5,544,302 A | * | 8/1996 | Nguyen | 345/837 |
| 5,555,365 A | * | 9/1996 | Selby et al. | 345/765 |
| 5,894,554 A | | 4/1999 | Lowery et al. | 707/104.1 |
| 5,903,894 A | * | 5/1999 | Reneris | 707/100 |
| 5,930,512 A | * | 7/1999 | Boden et al. | 717/102 |
| 5,956,736 A | * | 9/1999 | Hanson et al. | 345/760 |

| | | | | |
|---|---|---|---|---|
| 6,026,433 A | * | 2/2000 | D'Arlach et al. | 707/10 |
| 6,028,998 A | * | 2/2000 | Gloudeman et al. | 717/108 |
| 6,052,670 A | * | 4/2000 | Johnson | 705/27 |
| 6,199,082 B1 | * | 3/2001 | Ferrel et al. | 715/522 |
| 6,219,680 B1 | * | 4/2001 | Bernardo et al. | 707/501.1 |
| 6,226,648 B1 | * | 5/2001 | Appleman et al. | 707/102 |
| 6,247,032 B1 | * | 6/2001 | Bernardo et al. | 345/733 |
| 6,253,282 B1 | * | 6/2001 | Gish | 709/203 |
| 6,308,188 B1 | * | 10/2001 | Bernardo et al. | 707/501.1 |

OTHER PUBLICATIONS

Lewandowski, Framework for Component–Based Client/ Server Computing, Mar. 1998, ACM, pp. 3–27.*

* cited by examiner

*Primary Examiner*—John Chavis
(74) *Attorney, Agent, or Firm*—Brown Raysman Millstein Felder & Steiner LLP

(57) **ABSTRACT**

A system and method for generating computer applications in an arbitrary object framework. The method separates content, form, and function of the computer application so that each may be accessed or modified separately. The method includes creating arbitrary objects, managing the arbitrary objects throughout their life cycle in an object library, and deploying the arbitrary objects in a design framework for use in complex computer applications.

**53 Claims, 2 Drawing Sheets**





*FIG. 1*
*(PRIOR ART)*



*FIG. 2*



*FIG. 3*          *FIG. 4*



FIG. 5

US 6,826,744 B1

# SYSTEM AND METHOD FOR GENERATING WEB SITES IN AN ARBITRARY OBJECT FRAMEWORK

## TECHNICAL FIELD OF THE INVENTION

This invention relates generally to systems and methods for generating software applications in an arbitrary object framework, and more specifically to systems and methods for generating web sites in an arbitrary object framework.

## BACKGROUND OF THE INVENTION

Three processes used to create complex software applications such as web sites are form, function, and content. Form includes graphic designs, user interfaces, and graphical representations created by a designer or a group of designers. Function includes logical functionality, which can be software code created by a programmer or group of programmers. Content includes informative content. Informative content can include written, recorded, or illustrated documentation, such as photographs, illustrations, product marketing material, and news articles. Content can be created by writers, photographers, artists, reporters, or editors.

Currently, typical workflows dictate a serial approach to integrating the form, function, and content to create complex software applications such as a web site. The serial approach is illustrated in FIG. 1. In FIG. 1, content 10 for a complex software application can be chosen or created. Form 12 for the presentation of content 10 can then be created. Functionality 14 can then be generated using code to create the complex software application (product 16) with the desired information (content 10) and style (form 12). Using the method illustrated in FIG. 1, every final component of the complex software application must be manipulated by a programmer before it is ready to be used. The exact workflow may vary from industry to industry or business to business, but the basic restrictions are generally the same.

A traditional approach such as that illustrated in FIG. 1, may create unwanted bottlenecks in the production process. Each upstream revision, such as a change of content 10 or design 12, forces a repetition of the entire process. As an example, consider a web site for a large newspaper. The web site may have a function that can include a file into the web site. The marketing department may decide to change the appearance of the header on the web site depending on the browser of a user. In this case, a programmer may need to invoke an external script or embed some specific logic within the web site. Unfortunately, if there is a large web site with thousands of pages of information stored on a server, the programmer may have to change every one of the thousands of pages. Therefore, a small change by the marketing department can cause a large burden on the programming department.

Prior art solutions have succeeded in partially separating some of these functions. Notably, content management databases and digital repositories provide a means of separating content from form and function. Likewise, sophisticated software development teams frequently employ internal code structuring techniques that can help to minimize dependencies between interface designs and the functions they access. However, content management tools typically fail to address form/function issues. Therefore, there can still be production slow-downs due to changes in form that require a subsequent change in functionality.

## SUMMARY OF THE INVENTION

Therefore a need exists for a method of generating complex software applications that reduces or eliminates production delays and the workload for programmers due to changes in content and/or form. This method should separate form, content and function so that each area can be independently changed.

The present invention provides a system and method for generating software applications that substantially eliminates or reduces disadvantages and problems associated with previously developed systems and methods used for generation of software applications. More specifically, the present invention provides a method for generating software applications in an arbitrary object framework. The method of the present invention separates content, form, and function of the computer application so that each may be accessed or modified independently. The method of this invention includes creating arbitrary objects, managing the arbitrary objects throughout their life cycle, and deploying the arbitrary objects in a design framework for use in complex computer applications.

The present invention provides an important technical advantage in that content, form, and function are separated from each other in the generation of the software application. Therefore, changes in design or content do not require the intervention of a programmer. This advantage decreases the time needed to change various aspects of the software application. Consequently, cost is reduced and versatility is increased.

The present invention provides another technical advantage in that users are not required to use a proprietary language to encode. These arbitrary objects may include encapsulated legacy data, legacy systems and custom programming logic from essentially any source in which they may reside. Any language supported by the host system, or any language that can be interfaced to by the host system, can be used to generate an object within the application.

The present invention provides yet another technical advantage in that it can provide a single point of administrative authority that can reduce security risks. For instance, a large team of programmers can work on developing a large group of arbitrary objects within the object library. If one object has a security hole, an administrator can enter the object library and disable that arbitrary object.

Still another technical advantage of the present invention is that it enables syndication of the software application. As noted above, functionality is separate from form and content. Consequently, a user can easily introduce a new look for the application or syndicate the content and functionality of the application to another group without having to recode all of the objects needed to access content.

Another technical advantage of the present invention is that it allows for personalization and profiling. With personalization, the web presentation is tailored to the specific needs of the web user based on the user's past history. Profiling also enables tailoring a web site or presentation. Profiling is dependent on environmental variables such as browser type or IP address.

## BRIEF DESCRIPTION OF THE DRAWINGS

A more complete understanding of the present invention and the advantages thereof may be acquired by referring to the following description, taken in conjunction with the accompanying drawings in which like reference numbers indicate like features and wherein:

FIG. 1 illustrates a prior art workflow diagram for generating a software product;

FIG. 2 is a hierarchical workflow diagram for one embodiment of the present invention;

3

FIG. **3** is a flow diagram for one embodiment of the present invention;

FIG. **4** is a flow diagram for the embodiment illustrated in FIG. **4**.

FIG. **5** is a diagram illustrating the components of one embodiment of the present invention used to generate web sites; and

## DETAILED DESCRIPTION OF THE INVENTION

Preferred embodiments of the present invention are illustrated in the FIGUREs, like numerals being used to refer to like and corresponding parts of various drawings.

The present invention provides a system and method for using a hierarchical, arbitrary object framework for generating software applications. The method separates content, form, and function of the software application so that each can be accessed or modified independently. The method of this invention includes creating arbitrary objects, managing the arbitrary objects in an object library, and deploying the arbitrary objects in a design framework for use in computer applications.

FIG. **2** is a hierarchical workflow diagram for the present invention. Product **6** includes three contributing groups: content **10**, form **12**, and functionality **14**. Content **10** can include written, recorded, or illustrated collateral such as documentation, photographic illustrations, product marketing material, and articles. Form **12** can include graphic designs such as user interfaces and graphical presentations. Function **14** can include the logical functionality of software code and scripts. The hierarchical framework separates content **10**, form **12**, and functionality **14** to generate product **16**. Product **16** may be a computer software application such as a web site. Since content **10**, design **12**, and functionality **14** are separate entities independent of each other, modifications in one group does not require corresponding modifications in another group. Each group can contribute to product **16** directly.

FIG. **3** is a flow diagram of one embodiment of the present invention. At step **20**, arbitrary objects can be generated. Arbitrary objects may include any combination of application logic and data desired by a developer. Arbitrary objects can include text file pointers, binary file pointers, compiled executables, scripts, data base queries, shell commands, remote procedure calls, global variables, and local variables. The arbitrary object framework allows arbitrary objects to be referenced in a consistent manner regardless of the type. Also, the arbitrary object framework allows local arbitrary objects to either override global parent arbitrary objects or inherit capabilities and data from the global parent, regardless of the type of the local arbitrary object.

At step **22**, these arbitrary objects can be managed in an object library. The life cycle of these objects may be managed in a consistent manner using revision tracking, roll back, and sign off. At step **24**, objects can be deployed from the object library into a design framework to create the software application. Because the object pointers are not tied in any way to the functionality of the object, an object of one type can be easily replaced with another object of another type. This eliminates a common problem in content management systems of the inability to preview content within its appropriate location on the site or within the system. Normally, a special system made for the purpose of previewing a piece of content would have to be hard-coded to view the current approved live content for all other pieces except the piece in question. This multiplies the design

4

problem, because changes in the design in the main site change all previous templates. In the method of the present invention, since all that exists within the framework is an arbitrary object, the arbitrary object can be swapped for another object that pulls the current piece content in question.

Using one embodiment of this invention, for example, the Features or Editorials page of a newspaper can be dynamically replaced. The present invention can execute all the normal objects that can be placed on the page to show the content as it would appear, and then take the one piece in question and replace it with a second object to be examined. Objects may be deployed globally across an entire system or locally within a specific area or sub-areas of a system.

FIG. **4** represents a flow diagram of another embodiment of the present invention. At step **30**, arbitrary objects can be generated. At step **32**, the arbitrary objects can be managed in an object library. Arbitrary objects can be deployed in a container page at step **34** to generate a web site.

Arbitrary objects may include any combination of application logic and data desired by a developer. Arbitrary objects can include text file pointers, binary file pointers, compiled executable scripts, database queries, shell commands, remote call procedures, global variables and local variables. Arbitrary objects may also include cached data queries and executables. The arbitrary object framework allows arbitrary objects to be referenced in a consistent manner regardless of the type of object. Also, the arbitrary object framework allows local arbitrary objects to either override global parent arbitrary objects or inherit capabilities and data from the global parent arbitrary object.

Arbitrary objects can execute any function that can be run or understood by the host computer system so that any underlying functionality of the operating system used by the host system can be defined as an object within the arbitrary framework. Legacy data, document objects, CPI programs, and database queries can all be encapsulated as objects within the arbitrary framework. The arbitrary object can be accessed by an arbitrary object name. Arbitrary objects are not tied to their functionality. One arbitrary object can be easily replaced with another arbitrary object of another type.

Arbitrary objects can be managed in an object library. The life cycle of the arbitrary objects may be managed in a consistent manner using revision tracking, roll-back, and sign-off. The object library can include separate specialized object libraries that can be administered separately by different developers in each area. For instance, for a web site used to generate a newspaper, there may be an advertising object library that is physically distinguished from other object libraries, such as an object library for sports or an object library for news. Therefore, queries for advertising can be created without impacting any other area of the web site.

Arbitrary objects can be deployed from the object library into a container page to generate the web site. The container page is a truly dynamic page. Unlike prior art methods, where a static copy of information is often pushed over a firewall to a live web site, the present invention incorporates object caching. An arbitrary object can be cached, rather than caching an entire page. When the arbitrary object is cached, certain elements of the arbitrary object can be specified as dynamic elements while others can be specified as static elements. Therefore, a web site can contain multiple dynamic web pages wherein objects used to construct the form, function, and content of the web page can contain dynamic elements and static elements. This provides flex-

US 6,826,744 B1

5

ibility for what needs to be computed or processed at the time that someone, such as a web user, accesses the web page.

FIG. 5 shows the components of one embodiment of the present invention used to generate web sites. A user with web browser 40 can connect to web server 44 through internet or intranet 42. Web server 44 can access static HTML web documents 46 as well as dynamic HTML documents 52. Dynamic HTML web documents 52 can be created using Web OS Object Manager 50. Dynamic HTML Web document 52 can include document objects 56, shell scripts 58, CGI programs 60, and database queries 62. Document objects 56, shell scripts 58, CGI programs 60, and database queries 62 can be stored in WebOS object library 54. Database queries 62 can result from extracting information from WebOS Information Database 68 and inputting the information into Dynamic HTML Web Template 66.

User Profile and Password Database 70 can provide web sites or systems with a means to take advantage of customer profiles to look at customer preferences or history, and dynamically replace a website object with another object that contains content information matching the user profile or preferences. Thus, the web site or system can dynamically allocate the correct content for a customer. This is important in commerce applications. A customer's buying history can be examined for trend items and the customer presented products that match his or her profile. Present personalization systems are written purely in custom code and require an inordinately large amount of time to construct the custom applications necessary to interpret the preferences of an individual user.

The method of present invention can perform object caching. This means that an object can be cached instead of caching an entire page. Object caching permits specifying elements of an object to be dynamic and elements of the object to be static. A system user can thus have the flexibility of specifying what needs to be computed or processed at the time a user accesses the system versus trying to anticipate and calculate in advance and cache and post the object over to a server.

Many functions are stored within an object library on an arbitrary object framework such that those functions can be accessed by name arbitrarily. This is in contrast to a traditional model where the function must be explicitly invoked with all its parameters included. Objects may execute any function that can be run or understood by the host computer system so that any underlying functionality of the host's operating system can be defined as an object within the framework of the method of the present invention. The object library can contain legacy data, document objects, CTI programs, and/or database queries, that can all be encapsulated as objects within a framework and accessed from within a design. All that is needed is the name of the function in order to access the function.

Objects can be controlled to perform functions based on a profile of an individual and environmental variables, such as the type of browser, the country of the individual or the individual's IP address. A specific competitor may be blocked from seeing certain objects on a web page created using the method of the present invention.

A critical distinction between the present invention and previous object oriented development systems is the need to know how a function can be called and what to expect it to return, rather than just knowing the function's name. This means that typically the system administrator calls the name of an object and passes parameters to the object. Any and all

6

variable information or environmental information can be available to every object. The environment space can be available to all objects executed and an object can arbitrarily take advantage of any of the environmental information, depending on the design of the object.

Different areas of a web site can be administered separately by different developers in each of these areas. An advertising object library can be physically distinguished from other object libraries, such as those for sports and news. An advertising programmer can create new queries for the advertising section of a site without having to worry about affecting other areas of the site.

The present invention allows different object types to be interchangeable. The object name is essentially just another variable in the environment. Also different variables can also be interchangeable. The object framework can be designed such that objects and variables can be kept in the same name space, every object can have access to all the environmental settings, and every object pointer can potentially be another name in the name space.

Object caching, rather than page caching can be implemented with the present invention. These objects can be stored in an object library. An object in the object library can be a file, a global variable, an executable script, a database query, a cached executable or a cached database query. This means that the results of a query can be stored in a static file using the object name as long as the static file has not expired. This is important if the query is a lengthy query.

A technical advantage of the present invention is that it allows for syndication. Syndication enables the content and function of a particular web site to be syndicated to another web site or web presentation. For instance, if a company would like to roll out a new look or syndicate its content and functionality to another business, this can be easily accomplished using the present invention. Since there is no application code resident in a web page itself, the same data can be repackaged in a number of different ways across multiple sites. There is no need to recode the design elements or design pages on the web site or recode any functions that are needed to access the content of the website. The present invention enables electronic store fronts to sell from a single source with a unique interface design. Also, newspaper chains can distribute international and national content from a single source and add local content themselves.

Another technical advantage of the present invention is that it allows for a single point of control when developing a web site. Therefore, if a large team of developers are working on a site, and multiple persons are contributing arbitrary objects to the overall arbitrary framework, then if one of the arbitrary objects has a security hole in it, the arbitrary object can be easily accessed in the object library and disabled. This security feature can immediately shut down that function across the entire web site and patch the security hole.

The present invention provides still another technical advantage in that it allows for personalization. Personalization enables companies that want to take advantage of a customer profile to look at the customer's preferences or histories and deploy information to the web site specific to the customer.

Another technical advantage of the present invention allows for profiling. Profiling enables control over the arbitrary objects presented in a web site based on a profile of the individual accessing the web site. Profiling entails determining different environmental variables such as the type of browser hitting the site, the country of the individual access-

US 6,826,744 B1

7

ing the site, and/or the individual's IP address. This can enable a company to present specific information to the individual based on the individual's environmental variables.

Although the present invention has been described in detail herein with reference to the illustrative embodiments, it should be understood that the description is by way of example only and is not to be construed in a limiting sense. It is to be further understood, therefore, that numerous changes in the details of the embodiments of this invention and additional embodiments of this invention will be apparent to, and may be made by, persons of ordinary skill in the art having reference to this description. It is contemplated that all such changes and additional embodiments are within the spirit and true scope of this invention as claimed below.

What is claimed is:

1. A method for generating a computer application on a host system in an arbitrary object framework that separates a content of said computer application, a form of said computer application and a functionality of said computer application, said method comprising:

creating arbitrary objects with corresponding arbitrary names of various object types for generating said content of said computer application, said form of said computer application, and said functionality of said computer application;

managing said arbitrary objects in an object library; and

deploying said arbitrary objects from said object library into a design framework to create said computer application.

2. The method of claim 1, wherein said computer application is a web site.

3. The method of claim 1, wherein said various object types comprise text file pointers.

4. The method of claim 1, wherein said various object types comprise binary file pointers.

5. The method of claim 1, wherein said various object types comprise compiled executables.

6. The method of claim 1, wherein said various object types comprise shell commands.

7. The method of claim 1, wherein said various object types comprise remote procedure calls.

8. The method of claim 1, wherein said various object types comprise global variables.

9. The method of claim 1, wherein said various object types comprise cached executables.

10. The method of claim 1, wherein said various object types comprise cached database queries.

11. The method of claim 1, wherein said various object types comprise local variables.

12. The method of claim 1, wherein said various object types comprise local objects and global parent objects.

13. The method of claim 12, wherein said local objects can override said global parent objects.

14. The method of claim 12, wherein said local objects inherit data from said global parent objects.

15. The method of claim 12, wherein said local objects inherit capabilities from said global parent objects.

16. The method of claim 1, further comprising deploying arbitrary objects globally.

17. The method of claim 1, further comprising deploying arbitrary objects locally.

18. The method of claim 1, wherein the step of managing said arbitrary objects further comprises using revision tracking.

19. The method of claim 1, wherein the step of managing said arbitrary objects further comprises using rollback.

8

20. The method of claim 1, wherein the step managing further comprises using signoff.

21. The method of claim 1, wherein said arbitrary objects can be accessed and deployed into said design framework using said corresponding arbitrary names.

22. The method of claim 1, further comprising swapping an arbitrary object of one type with an arbitrary object of another type.

23. The method of claim 1, further comprising caching objects.

24. The method of claim 23, wherein the step of caching objects further comprises specifying some elements of an arbitrary object to be dynamic elements and specifying some elements of said arbitrary object to be static elements.

25. The method of claim 1, further comprising generating arbitrary objects in a programming language that is compatible or supported by said host system.

26. A method for generating a web site on a host system in an arbitrary object framework that separates a content of said web site, a form of said web site, and a functionality of said web site, said method comprising:

creating arbitrary objects with corresponding arbitrary names of various object types for generating said content of said web site, said form of said web site, and said functionality of said web site; managing said arbitrary objects in an object library; and

deploying said arbitrary objects from said object library to a container page to create said web site.

27. The method of claim 26, wherein said various object types comprise text file pointers.

28. The method of claim 26, wherein said various object types comprise binary file pointers.

29. The method of claim 26, wherein said various object types comprise compiled executables.

30. The method of claim 26, wherein said various object types comprise shell commands.

31. The method of claim 26, wherein said various object types comprise remote procedure calls.

32. The method of claim 26, wherein said various object types comprise global variables.

33. The method of claim 26, wherein said various object types comprise local variables.

34. The method of claim 26, wherein said various object types comprise local objects and global parent objects.

35. The method of claim 34, wherein said local objects can override said global parent objects.

36. The method of claim 34, wherein said local objects inherit data from said global parent objects.

37. The method of claim 34, wherein said local objects inherit capabilities from said global parent objects.

38. The method of claim 26, further comprising deploying arbitrary objects globally.

39. The method of claim 26, further comprising deploying arbitrary objects locally.

40. The method of claim 26, wherein the step of managing said arbitrary objects further comprises using revision tracking.

41. The method of claim 26, wherein the step of managing said arbitrary objects further comprises using rollback.

42. The method of claim 26, wherein the step managing said arbitrary objects further comprises using signoff,.

43. The method of claim 26, wherein said arbitrary objects can be accessed and deployed into said container page using said corresponding arbitrary names.

44. The method of claim 26, further comprising swapping an arbitrary object of one type with an arbitrary object of another type.

US 6,826,744 B1

**9**

**45**. The method of claim **26**, further comprising caching objects.

**46**. The method of claim **45**, wherein the step of caching objects further comprises specifying some elements of an arbitrary object to be dynamic elements and specifying some elements of said arbitrary object to be static elements.

**47**. The method of claim **26**, further comprising generating arbitrary objects in a programming language that is compatible or supported by said host system.

**48**. The method of claim **26**, wherein said various object types comprise cached executable.

**49**. The method of claim **25**, wherein said various object types comprise cached database queries.

**10**

**50**. The method of claim **26**, further comprising profiling of a user accessing said web site.

**51**. The method of claim **26**, further comprising personalization of said web site for a user accessing said web site.

**52**. The method of claim **26**, wherein said container page comprises arbitrary objects with both dynamic and static elements.

**53**. The method of claim **26**, wherein said content of said web site and said function of said web site can be syndicated.

\*   \*   \*   \*   \*

UNITED STATES PATENT AND TRADEMARK OFFICE

# CERTIFICATE OF CORRECTION

PATENT NO.    : 6,826,744 B1                                  Page 1 of  1
DATED         : November 30, 2004
INVENTOR(S)   : Aubrey McAuley

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

Column 5,
Line 10, delete "Web OS" and insert -- WebOS --.

Column 8,
Line 61, delete "," at end of sentence.

Signed and Sealed this

Fifth Day of April, 2005

JON W. DUDAS
*Director of the United States Patent and Trademark Office*



US006826744C1

(12) **EX PARTE REEXAMINATION CERTIFICATE** (9412th)

# United States Patent

McAuley

(10) **Number:** **US 6,826,744 C1**

(45) **Certificate Issued:** **Nov. 16, 2012**

(54) **SYSTEM AND METHOD FOR GENERATING WEB SITES IN AN ARBITRARY OBJECT FRAMEWORK**

(75) Inventor: **Aubrey McAuley**, Austin, TX (US)

(73) Assignee: **Vertical Computer Systems, Inc.**, Los Angeles, CA (US)

**Reexamination Request:**
No. 90/009,982, Jan. 6, 2012

**Reexamination Certificate for:**

| | |
|---|---|
| Patent No.: | **6,826,744** |
| Issued: | **Nov. 30, 2004** |
| Appl. No.: | **09/410,334** |
| Filed: | **Oct. 1, 1999** |

Certificate of Correction issued Apr. 5, 2005.

(51) **Int. Cl.**
*G06F 9/45* (2006.01)
*G06F 19/00* (2006.01)

(52) **U.S. Cl.** .................................................... **717/108**

(58) **Field of Classification Search** ........................ None
See application file for complete search history.

(56) **References Cited**

To view the complete listing of prior art documents cited during the proceeding for Reexamination Control Number 90/009,982, please refer to the USPTO's public Patent Application Information Retrieval (PAIR) system under the Display References tab.

*Primary Examiner* — Salman Ahmed

(57) **ABSTRACT**

A system and method for generating computer applications in an arbitrary object framework. The method separates content, form, and function of the computer application so that each may be accessed or modified separately. The method includes creating arbitrary objects, managing the arbitrary objects throughout their life cycle in an object library, and deploying the arbitrary objects in a design framework for use in complex computer applications.



US 6,826,744 C1

**1**

# EX PARTE
# REEXAMINATION CERTIFICATE
# ISSUED UNDER 35 U.S.C. 307

THE PATENT IS HEREBY AMENDED AS
INDICATED BELOW.

Matter enclosed in heavy brackets **[ ]** appeared in the
patent, but has been deleted and is no longer a part of the
patent; matter printed in italics indicates additions made
to the patent.

AS A RESULT OF REEXAMINATION, IT HAS BEEN
DETERMINED THAT:

The patentability of claims **6**, **8**, **19**, **22**, **30**, **32**, **41**, **44**, **50**
and **51** is confirmed.

Claims **1** and **26** are cancelled.

Claims **2-5**, **7**, **9-11**, **18**, **21**, **23**, **25**, **27-29**, **31**, **33**, **40**, **45**,
**47-49** and **52-53** are determined to be patentable as amended.

Claims **24** and **46**, dependent on an amended claim, are
determined to be patentable.

New claims **54-57** are added and determined to be
patentable.

Claims **12-17**, **20**, **34-39** and **42-43** were not reexamined.

**2**. The method of claim **[1]** *56*, wherein said computer
application is a web site.

**3**. The method of claim **[1]** *56*, wherein said various object
types comprise text file pointers.

**4**. The method of claim **[1]** *56*, wherein said various object
types comprise binary file pointers.

**5**. The method of claim **[1]** *56*, wherein said various object
types comprise compiled executables.

**7**. The method of claim **[1]** *56*, wherein said various object
types comprise remote procedure calls.

**9**. The method of claim **[1]** *56*, wherein said various object
types comprise cached executables.

**10**. The method of claim **[1]** *56*, wherein said various object
types comprise cached database queries.

**11**. The method of claim **[1]** *56*, wherein said various object
types comprise local variables.

**18**. The method of claim **[1]** *56*, wherein the step of man-
aging said arbitrary objects further comprises using revision
tracking.

**21**. The method of claim **[1]** *56*, wherein said arbitrary
objects can be accessed and deployed into said design frame-
work using said corresponding arbitrary names.

**23**. The method of claim **[1]** *56*, further comprising caching
objects.

**25**. The method of claim **[1]** *56*, further comprising gener-
ating arbitrary objects in a programming language that is
compatible or supported by said host system.

**27**. The method of claim **[26]** *57*, wherein said various
object types comprise text file pointers.

**28**. The method of claim **[26]** *57*, wherein said various
object types comprise binary file pointers.

**29**. The method of claim **[26]** *57*, wherein said various
object types comprise compiled executables.

**31**. The method of claim **[26]** *57*, wherein said various
object types comprise remote procedure calls.

**33**. The method of claim **[26]** *57*, wherein said various
object types comprise local variables.

**40**. The method of claim **[26]** *57*, wherein the step of
managing said arbitrary objects further comprises using revi-
sion tracking.

**45**. The method of claim **[26]** *57*, further comprising cach-
ing objects.

**47**. The method of claim **[26]** *57*, further comprising gen-
erating arbitrary objects in a programming language that is
compatible or supported by said host system.

**48**. The method of claim **[26]** *57*, wherein said various
object types comprise cached executable.

**49**. The method of claim **[25]** *57*, wherein said various
object types comprise cached database queries.

**52**. The method of claim **[26]** *57*, wherein said container
page comprises arbitrary objects with both dynamic and static
elements.

**53**. The method of claim **[26]** *57*, wherein said content of
said web site and said function of said web site can be syn-
dicated.

*54. A method for generating a computer application on a
host system in an arbitrary object framework that separates a
content of said computer application, a form of said computer
application and a functionality of said computer application,
said method comprising:*

    *creating arbitrary objects with corresponding arbitrary
names of various object types for generating said con-
tent of said computer application, said form of said
computer application, and said functionality of said
computer application;*

    *managing said arbitrary objects in an object library;*

    *deploying said arbitrary objects from said object library
into a design framework to create said computer appli-
cation; and*

    *swapping an arbitrary object of one type with an arbitrary
object of another type.*

*55. A method for generating a web site on a host system in
an arbitrary object framework that separates a content of
said web site, a form of said web site, and a functionality of
said web site, said method comprising:*

    *creating arbitrary objects with corresponding arbitrary
names of various object types for generating said con-
tent of said web site, said form of said web site, and said
functionality of said web site;*

    *managing said arbitrary objects in an object library;*

    *deploying said arbitrary objects from said object library to
a container page to create said web site; and*

    *swapping an arbitrary object of one type with an arbitrary
object of another type.*

*56. A method for generating a computer application on a
host system in an arbitrary object framework that separates a
content of said computer application, a form of said computer
application and a functionality of said computer application,
said method comprising:*

    *creating arbitrary objects with corresponding arbitrary
names of various object types for generating said con-
tent of said computer application, said form of said
computer application, and said functionality of said
computer application, said arbitrary objects being
objects that can be created independently by individual
preference, that are interchangeable, and that may be,
but need not be, accessed solely by name, the object
being an entity that can have form, content, or function-
ality or any combination of form, content and function-
ality;*

    *managing said arbitrary objects in an object library; and*

    *deploying said arbitrary objects from said object library
into a design framework to create said computer appli-
cation.*

*57. A method for generating a web site on a host system in
an arbitrary object framework that separates a content of*

US 6,826,744 C1

**3**

said web site, a form of said web site, and a functionality of said web site, said method comprising:

creating arbitrary objects with corresponding arbitrary names of various object types for generating said content of said web site, said form of said web site, and said functionality of said web site, said arbitrary objects being objects that can be created independently by individual preference, that are interchangeable, and that

**4**

may be, but need not be, accessed solely by name, the object being an entity that can have form, content, or functionality or any combination of form, content and functionality;

managing said arbitrary objects in an object library; and deploying said arbitrary objects from said object library to a container page to create said web site.

\* \* \* \* \*

EXHIBIT Q

US007716629B2

(12) **United States Patent** (10) **Patent No.:** **US 7,716,629 B2**
McAuley (45) **Date of Patent:** ***May 11, 2010**

(54) **SYSTEM AND METHOD FOR GENERATING WEB SITES IN AN ARBITRARY OBJECT FRAMEWORK**

(75) Inventor: **Aubrey McAuley**, Austin, TX (US)

(73) Assignee: **Vertical Computer Systems, Inc.**, Fort Worth, TX (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 613 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **10/999,911**

(22) Filed: **Nov. 29, 2004**

(65) **Prior Publication Data**

US 2005/0154486 A1 Jul. 14, 2005

**Related U.S. Application Data**

(63) Continuation of application No. 09/410,334, filed on Oct. 1, 1999, now Pat. No. 6,826,744.

(51) **Int. Cl.**
*G06F 9/45* (2006.01)

(52) **U.S. Cl.** ..................................... **717/100**

(58) **Field of Classification Search** ................. 717/106, 717/100, 149
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 5,544,302 A | * | 8/1996 | Nguyen | 715/837 |
| 5,555,365 A | * | 9/1996 | Selby et al. | 715/765 |
| 5,894,554 A | * | 4/1999 | Lowery et al. | 709/203 |
| 5,895,476 A | | 4/1999 | Orr et al. | |
| 5,903,894 A | * | 5/1999 | Reneris | 707/100 |
| 5,930,512 A | * | 7/1999 | Boden et al. | 717/102 |
| 5,956,736 A | * | 9/1999 | Hanson et al. | 715/513 |

| | | | | |
|---|---|---|---|---|
| 6,026,433 A | * | 2/2000 | D'Arlach et al. | 709/217 |
| 6,028,998 A | * | 2/2000 | Gloudeman et al. | 717/108 |
| 6,052,670 A | * | 4/2000 | Johnson | 705/27 |
| 6,199,082 B1 | * | 3/2001 | Ferrel et al. | 715/522 |
| 6,219,680 B1 | * | 4/2001 | Bernardo et al. | 715/501.1 |
| 6,226,648 B1 | * | 5/2001 | Appleman et al. | 707/102 |
| 6,247,032 B1 | * | 6/2001 | Bernardo et al. | 715/530 |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CA | 2110970 | 6/1995 |

OTHER PUBLICATIONS

Adhesive Media, Inc., Dynamic Web Management Tools, WebOS/ NewsFlash/SiteFlash, Assorted Documents, pp. MSVERT002 through MSVERT126.

(Continued)

*Primary Examiner*—John Chavis
(74) *Attorney, Agent, or Firm*—Scheef & Stone, L.L.P.; Jack D. Stone, Jr.

(57) **ABSTRACT**

A method and system for generating a computer application is disclosed. The computer application is generated on a host system in an arbitrary object framework that separates a content of said computer application, a form of said computer application and a functionality of said computer application. Arbitrary objects are created with corresponding arbitrary names of various object types for generating said content of said computer application, said form of said computer application, and said functionality of said computer application. The arbitrary objects are managed in an object library. The arbitrary objects are deployed from said object library into a design framework to create said computer application.

**32 Claims, 2 Drawing Sheets**



GENERATE ARBITRARY OBJECTS — 30

MANAGE ARBITRARY OBJECTS IN AN OBJECT LIBRARY — 32

DEPLOY ARBITRARY OBJECTS IN A CONTAINER PAGE — 34

WEB SITE

US 7,716,629 B2

Page 2

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 6,253,282 B1 * | 6/2001 | Gish | 711/113 |
| 6,308,188 B1 * | 10/2001 | Bernardo et al. | 715/530 |
| 6,553,563 B2 | 4/2003 | Ambrose et al. | |
| 6,574,635 B2 | 6/2003 | Stauber et al. | |
| 7,284,193 B1 | 10/2007 | Lindhorst | |
| 2002/0147805 A1 * | 10/2002 | Leshem et al. | 709/223 |
| 2002/0161734 A1 | 10/2002 | Stauber et al. | |

### OTHER PUBLICATIONS

Apple Computer, Inc., Inc., "The WebObjects Dynamic Elements Reference," http://developer.apple.com/ Documentation/ WebObjects/Reference/DynamicElements/DynamicElements.pdf, Jan. 10, 2006, WebObjects and the Enterprise Objects Framework, Chapt. 16.

Banick, et al.., "Using Microsoft FrontPage 98," Que Corporation (1998), Microsoft FrontPage, Chapt. 3.

Burke, "Web Databases with Cold Fusion 3," The McGraw-Hill Companies, Inc. (1998), Chapts. 1, 6, 9, and 15.

Buyens, "Running Microsoft FrontPage 98," Microsoft Press, Jim Buyens (1997), Microsoft FrontPage 98, Chapt. 4.

Darnell, et al., Using Macromedia Dreamweaver 1.2, Que (1998), Macromedia Dreamweaver, Chapts. 8 and 12.

Forta, "The ColdFusion 4.0 Web Application Construction Kit," Que (1998), ColdFusion 4.0, Chapts. 10 through 14.

Gray, "Web Publishing with Adobe PageMill 2," Ventana Communications Group, Inc., (1997), Adobe PageMill1, Chapts. 1 and 3.

Howell, "The Complete Idiot's Guide to Microsoft Visual InterDev," Que Corporation (1997), Microsoft Visual InterDev, Chapt. 4.

Jones, et al.., "Cascading Style Sheets: A Primer," MIS:Press, Big Tent Media Labs, LLC (1998), Dynamic HTML and Cascading Style Sheets, Chapt. 4.

Martin, et al., "Object-Oriented Methods: A Foundation," P T R Prentice Hall, (1995), Object-Oriented Programming Art, Chapts. 1 through 3.

Meyer, "Object-Oriented Software Construction," 2nd Ed., Prentice Hall PTR, (1997), Object-Oriented Programming Art, Chapt. 2.

Pollizi, "Separating Form from Function: The StarView Experience," Astronomical Data Analysis Software and Systems III, ASP Conference Series, vol. 61, pp. 88-91 (1994).

Prague, et al., "Access 97 Bible," IDG Books Worldwide, Inc. (1997), Microsoft Access 97, Chapts. 1 through 9, (Part 1).

Prague, et al., "Access 97 Bible," IDG Books Worldwide, Inc. (1997), Microsoft Access 97, Chapts. 10 through18, (Part 2).

Prague, et al., "Access 97 Bible," IDG Books Worldwide, Inc. (1997), Microsoft Access 97, Chapts. 19 through 26, (Part 3).

Prague, et al., "Access 97 Bible," IDG Books Worldwide, Inc. (1997), Microsoft Access 97, Chapts. 27 through 33, and Appendices (Part 4).

Webster, "NetObjects Fusion Handbook," Hayden Books (1996), Webster, NetObjects Fusion, Chapts. 9 through 13.

* cited by examiner



*FIG. 1*
*(PRIOR ART)*



*FIG. 2*



*FIG. 3*          *FIG. 4*



*FIG. 5*

US 7,716,629 B2

**1**

## SYSTEM AND METHOD FOR GENERATING WEB SITES IN AN ARBITRARY OBJECT FRAMEWORK

### RELATED APPLICATIONS

This application is a continuation of U.S. application Ser. No. 09/410,334, filed Oct. 1, 1999, now U.S. Pat. No. 6,826, 744.

### TECHNICAL FIELD OF THE INVENTION

This invention relates generally to systems and methods for generating software applications in an arbitrary object framework, and more specifically to systems and methods for generating web sites in an arbitrary object framework.

### BACKGROUND OF THE INVENTION

Three processes used to create complex software applications such as web sites are form, function, and content. Form includes graphic designs, user interfaces, and graphical representations created by a designer or a group of designers. Function includes logical functionality, which can be software code created by a programmer or group of programmers. Form includes informative content. Informative content can include written, recorded, or illustrated documentation, such as photographs, illustrations, product marketing material, and news articles. Content can be created by writers, photographers, artists, reporters, or editors.

Currently, typical workflows dictate a serial approach to integrating the form, function, and content to create complex software applications such as a web site. The serial approach is illustrated in FIG. 1. In FIG. 1, content 10 for a complex software application can be chosen or created. Form 12 for the presentation of content 10 can then be created. Functionality 14 can then be generated using code to create the complex software application (product 16) with the desired information (content 10) and style (form 12). Using the method illustrated in FIG. 1, every final component of the complex software application must be manipulated by a programmer before it is ready to be used. The exact workflow may vary from industry to industry or business to business, but the basic restrictions are generally the same.

A traditional approach such as that illustrated in FIG. 1, may create unwanted bottlenecks in the production process. Each upstream revision, such as a change of content 10 or design 12, forces a repetition of the entire process. As an example, consider a web site for a large newspaper. The web site may have a function that can include a file into the web site. The marketing department may decide to change the appearance of the header on the web site depending on the browser of a user. In this case, a programmer may need to invoke an external script or embed some specific logic within the web site. Unfortunately, if there is a large web site with thousands of pages of information stored on a server, the programmer may have to change every one of the thousands of pages. Therefore, a small change by the marketing department can cause a large burden on the programming department.

Prior art solutions have succeeded in partially separating some of these functions. Notably, content management databases and digital repositories provide a means of separating content from form and function. Likewise, sophisticated software development teams frequently employ internal code structuring techniques that can help to minimize dependencies between interface designs and the functions they access.

**2**

However, content management tools typically fail to address form/function issues. Therefore, there can still be production slow-downs due to changes in form that require a subsequent change in functionality.

### SUMMARY OF THE INVENTION

Therefore a need exists for a method of generating complex software applications that reduces or eliminates production delays and the workload for programmers due to changes in content and/or form. This method should separate form, content and function so that each area can be independently changed.

The present invention provides a system and method for generating software applications that substantially eliminates or reduces disadvantages and problems associated with previously developed systems and methods used for generation of software applications. More specifically, the present invention provides a method for generating software applications in an arbitrary object framework. The method of the present invention separates content, form, and function of the computer application so that each may be accessed or modified independently. The method of this invention includes creating arbitrary objects, managing the arbitrary objects throughout their life cycle, and deploying the arbitrary objects in a design framework for use in complex computer applications.

The present invention provides an important technical advantage in that content, form, and function are separated from each other in the generation of the software application. Therefore, changes in design or content do not require the intervention of a programmer. This advantage decreases the time needed to change various aspects of the software application. Consequently, cost is reduced and versatility is increased.

The present invention provides another technical advantage in that users are not required to use a proprietary language to encode. These arbitrary objects may include encapsulated legacy data, legacy systems and custom programming logic from essentially any source in which they may reside. Any language supported by the host system, or any language that can be interfaced to by the host system, can be used to generate an object within the application.

The present invention provides yet another technical advantage in that it can provide a single point of administrative authority that can reduce security risks. For instance, a large team of programmers can work on developing a large group of arbitrary objects within the object library. If one object has a security hole, an administrator can enter the object library and disable that arbitrary object.

Still another technical advantage of the present invention is that it enables syndication of the software application. As noted above, functionality is separate from form and content. Consequently, a user can easily introduce a new look for the application or syndicate the content and functionality of the application to another group without having to recode all of the objects needed to access content.

Another technical advantage of the present invention is that it allows for personalization and profiling. With personalization, the web presentation is tailored to the specific needs of the web user based on the user's past history. Profiling also enables tailoring a web site or presentation. Profiling is dependent on environmental variables such as browser type or IP address.

### BRIEF DESCRIPTION OF THE DRAWINGS

A more complete understanding of the present invention and the advantages thereof may be acquired by referring to

US 7,716,629 B2

**3**

the following description, taken in conjunction with the accompanying drawings in which like reference numbers indicate like features and wherein:

FIG. **1** illustrates a prior art workflow diagram for generating a software product;

FIG. **2** is a hierarchical workflow diagram for one embodiment of the present invention;

FIG. **3** is a flow diagram for one embodiment of the present invention;

FIG. **4** is a flow diagram for another embodiment of the present invention; and

FIG. **5** is a diagram illustrating the components of one environment of the present invention used to generate web sites.

DETAILED DESCRIPTION OF THE INVENTION

Preferred embodiments of the present invention are illustrated in the FIGURES, like numerals being used to refer to like and corresponding parts of various drawings.

The present invention provides a system and method for using a hierarchical, arbitrary object framework for generating software applications. The method separates content, form, and function of the software application so that each can be accessed or modified independently. The method of this invention includes creating arbitrary objects, managing the arbitrary objects in an object library, and deploying the arbitrary objects in a design framework for use in computer applications.

FIG. **2** is a hierarchical workflow diagram for the present invention. Product **16** includes three contributing parts: content **10**, form **12**, and functionality **14**. Content **10** can include written, recorded, or illustrated collateral such as documentation, photographic illustrations, product marketing material, and articles. Form **12** can include graphic designs such as user interfaces and graphical presentations. Function **14** can include the logical functionality of software code and scripts. The hierarchical framework separates content **10**, form **12**, and functionality **14** to generate product **16**. Product **16** may be a computer software application such as a web site. Since content **10**, design **12**, and functionality **14** are separate entities independent of each other, modification in one group does not require corresponding modifications in another group. Each group can contribute to product **16** directly.

FIG. **3** is a flow diagram of one embodiment of the present invention. At step **20**, arbitrary objects can be generated. Arbitrary objects may include any combination of application logic and data desired by a developer. Arbitrary objects can include text file pointers, binary file pointers, compiled executables, scripts, data base queries, shell commands, remote procedure calls, global variables, and local variables. The arbitrary object framework allows arbitrary objects to be referenced in a consistent manner regardless of the type. Also, the arbitrary object framework allows local arbitrary objects to either override global parent arbitrary objects or inherit capabilities and data from the global parent, regardless of the type of the local arbitrary object.

At step **22**, these arbitrary objects can be managed in an object library. The life cycle of these objects may be managed in a consistent manner using revision tracking, roll back, and sign off. At step **24**, objects can be deployed from the object library into a design framework to create the software application. Because the object pointers are not tied in any way to the functionality of the object, an object of one type can be easily replaced with another object of another type. This eliminates a common problem in content management sys-

**4**

tems of the inability to preview content within its appropriate location on the site or within the system. Normally, a special system made for the purpose of previewing a piece of content would have to be hard-coded to view the current approved live content for all other pieces except the piece in question. This multiplies the design problem, because changes in the design in the main site change all previous templates. In the method of the present invention, since all that exists within the framework is an arbitrary object, the arbitrary object can be swapped for another object that pulls the current piece content in question.

Using one embodiment of this invention, for example, the Features or Editorials page of a newspaper can be dynamically replaced. The present invention can execute all the normal objects that can be placed on the page to show the content as it would appear, and then take the one piece in question and replace it with a second object to be examined. Objects may be deployed globally across an entire system or locally within a specific area or sub-areas of a system.

FIG. **4** represents a flow diagram of another embodiment of the present invention. At step **30**, arbitrary objects can be generated. At step **32**, the arbitrary objects can be managed in an object library. Arbitrary objects can be deployed in a container page at step **34** to generate a web site.

Arbitrary objects may include any combination of application logic and data desired by a developer. Arbitrary objects can include text file pointers, binary file pointers, compiled executable scripts, database queries, shell commands, remote call procedures, global variables and local variables. Arbitrary objects may also include cached data queries and executables. The arbitrary object framework allows arbitrary objects to be referenced in a consistent manner regardless of the type of object. Also, the arbitrary object framework allows local arbitrary objects to either override global parent arbitrary objects or inherit capabilities and data from the global parent arbitrary object.

Arbitrary objects can execute any function that can be run or understood by the host computer system so that any underlying functionality of the operating system used by the host system can be defined as an object within the arbitrary framework. Legacy data, document objects, CGI programs, and database queries can all be encapsulated as objects within the arbitrary framework. The arbitrary object can be accessed by an arbitrary object name. Arbitrary objects are not tied to their functionality. One arbitrary object can be easily replaced with another arbitrary object of another type.

Arbitrary objects can be managed in an object library. The life cycle of the arbitrary objects may be managed in a consistent manner using revision tracking, roll-back, and sign-off. The object library can include separate specialized object libraries that can be administered separately by different developers in each area. For instance, for a web site used to generate a newspaper, there may be an advertising object library that is physically distinguished from other object libraries, such as an object library for sports or an object library for news. Therefore, queries for advertising can be created without impacting any other area of the web site.

Arbitrary objects can be deployed from the object library into a container page to generate the web site. The container page is a truly dynamic page. Unlike prior art methods, where a static copy of information is often pushed over a firewall to a live web site, the present invention incorporates object caching. An arbitrary object can be cached, rather than caching an entire page. When the arbitrary object is cached, certain elements of the arbitrary object can be specified as dynamic elements while others can be specified as static elements. Therefore, a web site can contain multiple dynamic

US 7,716,629 B2

5

web pages wherein objects used to construct the form, function, and content of the web page can contain dynamic elements and static elements. This provides flexibility for what needs to be computed or processed at the time that someone, such as a web user, accesses the web page.

FIG. 5 shows the components of one environment of the present invention used to generate web sites. A user with web browser 40 can connect to web server 44 through internet or intranet 42. Web server 44 can access static HTML web documents 46 as well as dynamic HTML documents 52. Dynamic HTML web documents 52 can be created using WebOS Object Manager 50. Dynamic HTML Web document 52 can include document objects 56, shell scripts 58, CGI programs 60, and database queries 62. Document objects 56, shell scripts 58, CGI programs 60, and database queries 62 can be stored in WebOS object library 54. Database queries 62 can result from extracting information from WebOS Information Database 68 and inputting the information into Dynamic HTML Web Template 66.

User Profile and Password Database 70 can provide web sites or systems with a means to take advantage of customer profiles to look at customer preferences or history, and dynamically replace a website object with another object that contains content information matching the user profile or preferences. Thus, the web site or system can dynamically allocate the correct content for a customer. This is important in commerce applications. A customer's buying history can be examined for trend items and the customer presented products that match his or her profile. Present personalization systems are written purely in custom code and require an inordinately large amount of time to construct the custom applications necessary to interpret the preferences of an individual user.

The method of the present invention can perform object caching. This means that an object can be cached instead of caching an entire page. Object caching permits specifying elements of an object to be dynamic and elements of the object to be static. A system user can thus have the flexibility of specifying what needs to be computed or processed at the time a user accesses the system versus trying to anticipate and calculate in advance and cache and post the object over to a server.

Many functions are stored within an object library on an arbitrary object framework such that those functions can be accessed by name arbitrarily. This is in contrast to a traditional model where the function must be explicitly invoked with all its parameters included. Objects may execute any function that can be run or understood by the host computer system so that any underlying functionality of the host's operating system can be defined as an object within the framework of the method of the present invention. The object library can contain legacy data, document objects, CGI programs, and/or database queries, that can all be encapsulated as objects within a framework and accessed from within a design. All that is needed is the name of the function in order to access the function.

Objects can be controlled to perform functions based on a profile of an individual and environmental variables, such as the type of browser, the country of the individual or the individual's IP address. A specific competitor may be blocked from seeing certain objects on a web page created using the method of the present invention.

A critical distinction between the present invention and previous object oriented development systems is the need to know how a function can be called and what to expect it to return, rather than just knowing the function's name. This means that typically the system administrator calls the name

6

of an object and passes parameters to the object. Any and all variable information or environmental information can be available to every object. The environment space can be available to all objects executed and an object can arbitrarily take advantage of any of the environmental information, depending on the design of the object.

Different areas of a web site can be administered separately by different developers in each of these areas. An advertising object library can be physically distinguished from other object libraries, such as those for sports and news. An advertising programmer can create new queries for the advertising section of a site without having to worry about affecting other areas of the site.

The present invention allows different object types to be interchangeable. The object name is essentially just another variable in the environment. Also different variables can also be interchangeable. The object framework can be designed such that objects and variables can be kept in the same name space, every object can have access to all the environmental settings, and every object pointer can potentially be another name in the name space.

Object caching, rather than page caching can be implemented with the present invention. These objects can be stored in an object library. An object in the object library can be a file, a global variable, an executable script, a database query, a cached executable or a cached database query. This means that the results of a query can be stored in a static file using the object name as long as the static file has not expired. This is important if the query is a lengthy query.

A technical advantage of the present invention is that it allows for syndication. Syndication enables the content and function of a particular web site to be syndicated to another web site or web presentation. For instance, if a company would like to roll out a new look or syndicate its content and functionality to another business, this can be easily accomplished using the present invention. Since there is no application code resident in a web page itself, the same data can be repackaged in a number of different ways across multiple sites. There is no need to recode the design elements or design pages on the web site or recode any functions that are needed to access the content of the website. The present invention enables electronic store fronts to sell from a single source with a unique interface design. Also, newspaper chains can distribute international and national content from a single source and add local content themselves.

Another technical advantage of the present invention is that it allows for a single point of control when developing a web site. Therefore, if a large team of developers are working on a site, and multiple persons are contributing arbitrary objects to the overall arbitrary framework, then if one of the arbitrary objects has a security hole in it, the arbitrary object can be easily accessed in the object library and disabled. This security feature can immediately shut down that function across the entire web site and patch the security hole.

The present invention provides still another technical advantage in that it allows for personalization. Personalization enables companies that want to take advantage of a customer profile to look at the customer's preferences or histories and deploy information to the web site specific to the customer.

Another technical advantage of the present invention allows for profiling. Profiling enables control over the arbitrary objects presented in a web site based on a profile of the individual accessing the web site. Profiling entails determining different environmental variables such as the type of browser hitting the site, the country of the individual accessing the site, and/or the individual's IP address. This can

US 7,716,629 B2

7

enable a company to present specific information to the individual based on the individual's environmental variables.

Although the present invention has been described in detail herein with reference to the illustrative embodiments, it should be understood that the description is by way of example only and is not to be construed in a limiting sense. It is to be further understood, therefore, that numerous changes in the details of the embodiments of this invention and additional embodiments of this invention will be apparent to, and may be made by, persons of ordinary skill in the art having reference to this description. It is contemplated that all such changes and additional embodiments are within the spirit and true scope of this invention as claimed below.

The invention claimed is:

1. A system for generating a computer application on a host system in an arbitrary object framework that separates a content of said computer application, a form of said computer application, and a functionality of said computer application, said system including a computer comprising a processor and a memory operably coupled to said processor, said memory being configured for storing a computer program executable by said processor, said computer program comprising:

a first set of executable instructions for creating arbitrary objects with corresponding arbitrary names of content objects used in generating said content of said computer application, form objects used in defining said form of said computer application, and function objects used in executing said functionality of said computer application each arbitrary object being separate from each other arbitrary object;

a second set of executable instructions for managing said arbitrary objects in an arbitrary object library; and

a third set of executable instructions for deploying said arbitrary objects from said arbitrary object library into a design framework to create said computer application.

2. The system of claim 1, wherein said computer application is a web site.

3. The system of claim 1, wherein each of said various object types include a type selected from the group consisting of: text file pointers; binary file pointers;

compiled executables; shell commands; remote procedure calls; global variables; cached executables; cached database queries; local variables; and local objects and global parent objects, wherein said local objects are capable of overriding said global parent objects, and wherein said local objects are capable of inheriting data from said global parent objects.

4. The system of claim 1, wherein the third set of executable instructions are for deploying arbitrary objects locally.

5. The system of claim 1, wherein the second set of executable instructions for managing said arbitrary objects further comprises executable instructions for revision tracking.

6. The system of claim 1, wherein the second set of executable instructions for managing said arbitrary objects further comprises executable instructions for using rollback.

7. The system of claim 1, wherein the second set of executable instructions for managing said arbitrary objects further comprises executable instructions for using signoff.

8. The system of claim 1, wherein the third set of exectable instructions include instructions to access and deploy arbitrary objects into said design framework using said corresponding arbitrary names.

9. The system of claim 1, further comprising executable instructions for swapping an arbitrary object of one type with an arbitrary object of another type.

10. The system of claim 1, further comprising executable instructions for caching objects.

8

11. The system of claim 10, wherein the executable instructions for caching objects further comprises exectable instructions for specifying some elements of an arbitrary object to be dynamic elements and specifying some elements of said arbitrary object to be static elements.

12. The system of claim 1, further comprising executable instructions for generating arbitrary objects in a programming language that is compatible and supported by said host system.

13. A system for generating a web site on a host system in an arbitrary object framework that separates a content of said web site, a form of said web site, and a functionality of said web site, said system including a computer comprising a processor and a memory operably coupled to said processor, said memory being configured for storing a computer program executable by said processor, said computer program comprising:

a first set of executable instructions for creating arbitrary objects with corresponding arbitrary names of content objects used in generating said content of said web site, form objects used in defining said form of said web site, and function objects used in executing said functionality of said web site, each arbitrary object being separate from each other arbitrary object;

a second set of executable instructions for managing said arbitrary objects in an arbitrary object library; and

a third set of executable instructions for deploying said arbitrary objects from said arbitrary object library to a container page to create said web site.

14. The system of claim 13, wherein each of said various object types include a type selected from the group consisting of: text file pointers; binary file pointers; compiled executables; shell commands; remote procedure calls; global variables; cached executables; cached database queries; local variables; and local objects and global parent objects, wherein said local objects are capable of overriding said global parent objects, and wherein said local objects are capable of inheriting data from said global parent objects.

15. The system of claim 13, wherein the third set of executable instructions are for deploying arbitrary objects locally.

16. The system of claim 13, wherein the second set of executable instructions for managing said arbitrary objects further comprises executable instructions for revision tracking.

17. The system of claim 13, wherein the second set of executable instructions for managing said arbitrary objects further comprises executable instructions for using rollback.

18. The system of claim 13, wherein the second set of executable instructions for managing said arbitrary objects further comprises executable instructions for using signoff.

19. The system of claim 13, wherein the third set of executable instructions include instructions to access and deploy arbitrary objects into said design framework using said corresponding arbitrary names.

20. The system of claim 19, wherein the third set of executable instructions is capable of accessing and deploying the arbitrary objects into said container page using said corresponding arbitrary names.

21. A system for generating a computer application on a host system in an arbitrary object framework that separates a content of said computer application, a form of said computer application, and a functionality of said computer application, said system including a computer comprising a processor and a memory operably coupled to said processor, said memory being configured for storing a computer program executable by said processor, said computer program comprising:

US 7,716,629 B2

9                                                            10

a first set of executable instructions for creating arbitrary objects with corresponding arbitrary names of content objects used in generating said content of said computer application, form objects used in defining said form of said computer application, and function objects used in executing said functionality of said computer application, each arbitrary object being callable by name only, each arbitrary object being independently modifiable without corresponding modifications being made to any other arbitrary object, and each arbitrary object further being interchangable with other arbitrary objects;

a second set of executable instructions for managing said arbitrary objects in an arbitrary object library; and

a third set of executable instructions for deploying said arbitrary objects from said arbitrary object library into a design framework to create said computer application.

**22**. The system of claim **21**, wherein said computer application is a web site.

**23**. The system of claim **21**, wherein each of said various object types include a type selected from the group consisting of: text file pointers; binary file pointers; compiled executables; shell commands; remote procedure calls; global variables; cached executables; cached database queries; local variables; and local objects and global parent objects, wherein said local objects are capable of overriding said global parent objects, and wherein said local objects are capable of inheriting data from said global parent objects.

**24**. The system of claim **21**, wherein the third set of executable instructions are for deploying arbitrary objects locally.

**25**. The system of claim **21**, wherein the second set of executable instructions for managing said arbitrary objects further comprises executable instructions for revision tracking.

**26**. The system of claim **21**, wherein the second set of executable instructions for managing said arbitrary objects further comprises executable instructions for using rollback.

**27**. The system of claim **21**, wherein the second set of executable instructions for managing said arbitrary objects further comprises executable instructions for using signoff.

**28**. The system of claim **21**, wherein the third set of executable instructions include instructions to access and deploy arbitrary objects into said design framework using said corresponding arbitrary names.

**29**. The system of claim **21**, further comprising executable instructions for swapping an arbitrary object of one type with an arbitrary object of another type.

**30**. The system of claim **21**, further comprising executable instructions for caching objects.

**31**. The system of claim **30**, wherein the executable instructions for caching objects further comprises exectable instructions for specifying some elements of an arbitrary object to be dynamic elements and specifying some elements of said arbitrary object to be static elements.

**32**. The system of claim **21**, further comprising executable instructions for generating arbitrary objects in a programming language that is compatible and supported by said host system.

*   *   *   *   *



US007716629C1

## (12) EX PARTE REEXAMINATION CERTIFICATE (9366th)

# United States Patent
## McAuley

(10) **Number:**     **US 7,716,629 C1**

(45) **Certificate Issued:**    ***Oct. 12, 2012**

---

(54) **SYSTEM AND METHOD FOR GENERATING WEB SITES IN AN ARBITRARY OBJECT FRAMEWORK**

(75) Inventor: **Aubrey McAuley**, Austin, TX (US)

(73) Assignee: **Vertical Computer Systems, Inc.**, Fort Worth, TX (US)

**Reexamination Request:**
No. 90/009,983, Mar. 5, 2012

**Reexamination Certificate for:**

| | |
|---|---|
| Patent No.: | **7,716,629** |
| Issued: | **May 11, 2010** |
| Appl. No.: | **10/999,911** |
| Filed: | **Nov. 29, 2004** |

(*) Notice: This patent is subject to a terminal disclaimer.

**Related U.S. Application Data**

(63) Continuation of application No. 09/410,334, filed on Oct. 1, 1999, now Pat. No. 6,826,744.

(51) **Int. Cl.**
*G06F 9/45*       (2006.01)

(52) **U.S. Cl.** ..................................................... **717/100**

(58) **Field of Classification Search** ........................ None
See application file for complete search history.

(56) **References Cited**

To view the complete listing of prior art documents cited during the proceeding for Reexamination Control Number 90/009,983, please refer to the USPTO's public Patent Application Information Retrieval (PAIR) system under the Display References tab.

*Primary Examiner* — Andrew Nalven

(57) **ABSTRACT**

A method and system for generating a computer application is disclosed. The computer application is generated on a host system in an arbitrary object framework that separates a content of said computer application, a form of said computer application and a functionality of said computer application. Arbitrary objects are created with corresponding arbitrary names of various object types for generating said content of said computer application, said form of said computer application, and said functionality of said computer application. The arbitrary objects are managed in an object library. The arbitrary objects are deployed from said object library into a design framework to create said computer application.



GENERATE ARBITRARY OBJECTS — 30

MANAGE ARBITRARY OBJECTS IN AN OBJECT LIBRARY — 32

DEPLOY ARBITRARY OBJECTS IN A CONTAINER PAGE — 34

WEB SITE

US 7,716,629 C1

**1**

# EX PARTE
# REEXAMINATION CERTIFICATE
# ISSUED UNDER 35 U.S.C. 307

THE PATENT IS HEREBY AMENDED AS
INDICATED BELOW.

**Matter enclosed in heavy brackets [ ] appeared in the patent, but has been deleted and is no longer a part of the patent; matter printed in italics indicates additions made to the patent.**

AS A RESULT OF REEXAMINATION, IT HAS BEEN
DETERMINED THAT:

The patentability of claims **21-26**, **29**, **30** and **32** is confirmed.

Claims **1**, **8**, **11**, **13**, **28** and **31** are determined to be patentable as amended.

Claims **2-6**, **9**, **10**, **12**, **14-17**, **19** and **20**, dependent on an amended claim, are determined to be patentable.

Claims **7**, **18** and **27** were not reexamined.

**1**. A system for generating a computer application on a host system in an arbitrary object framework that separates a content of said computer application, a form of said computer application, and a functionality of said computer application, said system including a computer comprising a processor and a memory operably coupled to said processor, said memory being configured for storing a computer program executable by said processor, said computer program comprising:

a first set of executable instructions for creating arbitrary objects with corresponding arbitrary names of content objects used in generating said content of said computer application, form objects used in defining said form of said computer application, and function objects used in executing said functionality of said computer application each arbitrary object being separate from each other arbitrary object, *said arbitrary objects being objects that can be created independently by individual preference, that are interchangeable, and that may be, but need not be, accessed solely by name, the object being an entity that can have form, content, or functionality or any combination of form, content and functionality*;

a second set of executable instructions for managing said arbitrary objects in an arbitrary object library; and

**2**

a third set of executable instructions for deploying said arbitrary objects from said arbitrary object library into a design framework to create said computer application.

**8**. The system of claim **1**, wherein the third set of [exectable] *executable* instructions include instructions to access and deploy arbitrary objects into said design framework using said corresponding arbitrary names.

**11**. The system of claim 10, wherein the executable instructions for caching objects further comprises [exectable] *executable* instructions for specifying some elements of an arbitrary object to be dynamic elements and specifying some elements of said arbitrary object to be static elements.

**13**. A system for generating a web site on a host system in an arbitrary object framework that separates a content of said web site, a form of said web site, and a functionality of said web site, said system including a computer comprising a processor and a memory operably coupled to said processor, said memory being configured for storing a computer program executable by said processor, said computer program comprising:

a first set of executable instructions for creating arbitrary objects with corresponding arbitrary names of content objects used in generating said content of said web site, form objects used in defining said form of said web site, and function objects used in executing said functionality of said web site, each arbitrary object being separate from each other arbitrary object, *said arbitrary objects being objects that can be created independently by individual preference, that are interchangeable, and that may be, but need not be, accessed solely by name, the object being an entity that can have form, content, or functionality or any combination of form, content and functionality*;

a second set of executable instructions for managing said arbitrary objects in an arbitrary object library; and

a third set of executable instructions for deploying said arbitrary objects from said arbitrary object library to a container page to create said web site.

**28**. The system of claim 21, wherein the third set of [exectable] *executable* instructions include instructions to access and deploy arbitrary objects into said design framework using said corresponding arbitrary names.

**31**. The system of claim 30, wherein the executable instructions for caching objects further comprises [exectable] *executable* instructions for specifying some elements of an arbitrary object to be dynamic elements and specifying some elements of said arbitrary object to be static elements.

\* \* \* \* \*